DOLATA and others, Respondents, vs. BERTHELET FUEL &
SUPPLY COMPANY, Appellant.

*November 18, 1948—February 15, 1949.*

For the appellant there was a brief by *Gold & McCann,* attorneys, and *A. J. Palasz* and *Eugene Daly* of counsel, all of Milwaukee, and oral argument by *Mr. Palasz* and *Mr. Daly.*

For the respondents there was a brief by *Treis & Corrigan,* attorneys, and *Alexander Lakes* of counsel, all of Milwaukee, and oral argument by *Mr. Lakes.*

FRITZ, J.    Upon our review of the proof introduced on the trial it is evident that the court was fully warranted in stating in its written decision that there were duly established certain facts of which it suffices on this appeal to note the following :

Plaintiffs own and reside in homes south of and immediately across the street from premises used by defendant as its coal and building-material yard.    The yard is on the southern fringe of an industrial business district in which there are to the north, some manufacturing plants and locomotives on railroad tracks and in a roundhouse, which emit smoke and soot.

Several types of bituminous coal are shipped to defendant in open railroad cars and the coal is unloaded in defendant's yard

with its movable crane, equipped with a boom and clamshell. The unloading is done by lowering the clamshell onto a carload of coal, and as the shell closes it fills up with coal and is then hoisted and the boom is swung around to a place near by where the coal is dropped on piles in defendant's yard. For reloading coal from the piles onto trucks, defendant operates a portable conveyor, which is backed up against a coal pile and then by means of buckets attached to a conveyor belt the coal is scooped up and dumped into a trough from which, after passing over a screen to permit smaller pieces to fall through, the coal is dropped onto trucks for delivery to customers. Defendant claims that ordinarily the screen is covered and that all the coal which is scooped up from the piles is deposited onto the trucks and that the screen is used ordinarily to sift out snow when it falls on the coal pile. However, defendant admits that on rare occasions coal handled with the conveyor is also screened.

Upon occasions when coal is transferred from cars to coal piles dust is created and blown around when the coal is dropped by the clamshell onto the piles from too high a level. While some of the coal is treated with oil at the mines to minimize the creation of dust, an inspection of the coal piles indicated that the oil treatment does not completely avoid the creation of dust. But Pocahontas coal is not so treated to keep down the dust. It is transferred with the clamshell from the cars into a wooden hopper having a capacity of about ten carloads. The hopper is set on posts at an elevation high enough so that coal may be unloaded from it onto trucks by force of gravity. In doing that the coal passes over a vibrating screen and runs down a trough onto the trucks. The hopper is open on top and when coal is dropped into it from the clamshell dust rises and is blown around by the wind. Moreover, the hopper is constructed of heavy rough lumber which is not tightly fitted and permits dust to seep through cracks, especially when the

coal passes over the vibrating screen. Such of the coal as passes through the screen falls into a bin and from time to time the screenings are hauled to a pile in the open yard and sold later. The handling of these screenings also creates dust which is scattered by the wind.

In defendant's handling of the coal, clouds of dust rise into the air and when the wind is from a northerly direction the coal dust is blown toward plaintiffs' homes and quantities of the dust fall upon and accumulate upon the porch railings and window sills of plaintiffs' homes, causing them to become dirty, and also seep under the doors and into their houses and injure and damage the interior walls, furniture, and carpeting. Because of the coal dust plaintiffs had to wash their walls oftener than would ordinarily be necessary and both the inside and the outside walls had to be painted more frequently. As to the presence of the coal dust in and around plaintiffs' houses, two chemists called as expert witnesses by plaintiffs testified that a considerable amount of coal dust was included in dust resulting from other causes which entered their houses; and that the coal dust was of an oily or greasy nature and would smear when rubbed or wiped off. A chemist called by defendant testified that his tests of samples which he took from deposits on houses south of defendant's yard showed that the ash content of those samples was far in excess of coal ash and that the samples other than the coal samples which he tested did not have sufficient heat value for heating purposes.

However, as the court stated in its decision,—

"All of this evidence did not contradict that in the dust samples taken from some of the plaintiffs' homes there was a considerable quantity of actual coal dust and that the latter could be traced to the defendant's coalyard. While the evidence establishes the fact that the source of the coal dust which is plaguing the plaintiffs is in the handling of Pocahontas coal, . . . much of the dust can be traced to the handling of other coal in open piles in defendant's yard. . . . It is the operation

of the coal business under the conditions as they now exist and have existed in the past that gives plaintiffs cause for complaint."

 And the court concluded that,—

" . . . from the manner in which defendant conducts its coal business and causes coal dust to emanate therefrom and thereby interferes with the comfort and enjoyment of plaintiffs' homes, it is maintaining a nuisance."

But in connection therewith, the court stated,—

"Plaintiffs presented evidence as to expenses incurred in washing their walls, painting their homes and otherwise in trying to overcome the effect of the coal dust. There is, however, no competent evidence which shows how much of this expense is chargeable to the coal dust and how much is chargeable to ordinary wear and the dust and soot which originates in places other than defendant's coalyard. In order to assess damages in favor of any of the plaintiffs because of these expenses the court would have to resort to guess and speculation. Upon the present state of the record the court feels justified in assessing plaintiffs' damages at only nominal amounts, not because they have not in fact sustained actual damages but because the evidence is insufficient to sustain any definite amounts."

Upon findings of fact and conclusions of law in accord with the above-stated matters in the court's decision, there was entered the judgment under review, which provided,—

"That from and after October 1, 1948, the defendant be enjoined from operating its coalyard in such a manner so that coal dust emanating from said coalyard can be blown onto the properties of the plaintiffs."

In view of the facts stated by the trial court, as noted above, and its conclusion that the handling of coal by defendant in the manner which permits and causes coal dust to be blown in the direction of plaintiffs' homes, such operations constitute a nuisance; and therefore the court was warranted under the law, as established and applied in the decisions of this court, to en-

join such operations by defendant.  As is stated in *Pennoyer v. Allen*, 56 Wis. 502, 511, 14 N. W. 609,—

"The ownership of land carries with it the rightful use of the atmosphere while passing over it.  Title to land gives to the owner the right to impregnate the air upon and over the same with such smoke, vapor, and smells as he desires, provided he does not contaminate the atmosphere to such an extent as to substantially interfere with the comfort or enjoyment of others, or impair the use of their property.  But air is movable, and constantly flowing from the premises of one to those of another, and hence, when it becomes thickly impregnated with putrid substances, it necessarily flows onto the adjacent premises in one direction or another.  This being so, it follows that any business which necessarily and constantly impregnates large volumes of the atmosphere with disagreeable, unwholesome, or offensive matter, may become a nuisance to those occupying adjacent property, in case it is so near, and the atmosphere is contaminated to such an extent, as to substantially impair the comfort or enjoyment of such adjacent occupants.  When such comfort and enjoyment are so impaired, and compensation is demanded, it is no defense to show that such business was conducted in a reasonable and proper manner, and with more than ordinary cleanliness, and that the odors so sent over and upon such adjacent premises were only such as were incident to the business when properly conducted.  It is the interruption of such enjoyment and the destruction of such comfort that furnishes the ground of action, and it is no satisfaction to the injured party to be informed that it might have been done with more aggravation.  The business is lawful; but such interruption and destruction is an invasion of private rights, and to that extent unlawful.  It is not so much the manner of doing as the proximity of such a business to the adjacent occupant which causes the annoyance.  A business necessarily contaminating the atmosphere to the extent indicated should be located where it will not necessarily deprive others of the enjoyment of their property, or lessen their comfort while occupying the same."

See also *Rogers v. John Week Lumber Co.* 117 Wis. 5, 9, 93 N. W. 821; *Greene v. Nunnemacher,* 36 Wis. 50; *Anstee v. Monroe Light & Fuel Co.* 171 Wis. 291, 177 N. W. 26;

*Price v. Oakfield Highland Creamery Co.* 87 Wis. 536, 58 N. W. 1039; *Middlestadt v. Waupaca Starch & Potato Co.* 93 Wis. 1, 66 N. W. 713; *Carey v. Dyer,* 97 Wis. 554, 73 N. W. 29; *Cunningham v. Miller,* 178 Wis. 22, 29, 189 N. W. 531; *Ballstadt v. Pagel,* 202 Wis. 484, 489, 232 N. W. 862; and *Hasslinger v. Hartland,* 234 Wis. 201, 209, 290 N. W. 647.

Defendant contends also that, as plaintiffs purchased their homes after defendant was operating its coalyard since 1928 and they knew or should have known the condition and general surroundings, they are estopped from seeking relief against defendant on the ground that its operation of the coalyard constitutes a nuisance.

On the other hand, plaintiffs contend that defendant does not have a prescriptive right to continue the nuisance created by its present manner of operating its coalyard even though it handled coal prior to the date complained of by plaintiffs, and that the nuisance became much greater because of a considerable increase in the quantity of coal handled by defendant after plaintiffs purchased their homes.

Plaintiffs' contentions in those respects must be sustained. As is stated in *Meiners v. Frederick Miller Brewing Co.* 78 Wis. 364, 366, 47 N. W. 430,—

"The defense of prescription does not lie either to a public prosecution or a private action to abate a common nuisance. . . . This being an action to abate a common nuisance and nothing more, the defense of prescription is not available. It is said in Wood, Nuis., sec. 727, that 'there can be no prescriptive for a *public* nuisance of any kind or description, and as to whether or not a person exercising a trade or occupation which is a public nuisance can acquire a prescriptive right to carry on the same, as against private or individual rights, is a question which, in this country, has never been definitely settled, but I think there can be no question but that, as a result of all the cases, such a right is not generally recognized.' We think the rule here suggested is the better one, and do not hesitate to adopt it."

And in *Behnisch v. Cedarburg Dairy Co.* 180 Wis. 34, 37, 192 N. W. 447, the court said,—

"The evidence is quite conclusive that the amount of waste water deposited in the creek in question had been largely increased during the two years immediately preceding the commencement of the action. Such being the case, we do not need to consider whether or not the defendant could acquire a prescriptive right to pollute the waters of the stream in question. If a prescriptive right could be acquired, it must necessarily be restricted to its limits when the period of prescription commenced, even though the right be asserted on behalf of the public. . . . A prescriptive right is not enlarged by the enlarged use during the period of prescription, enjoyed by those who claim it, but is measured by the extent of the use at the commencement of the prescriptive period."

Furthermore, as is stated in 39 Am. Jur., Nuisances, p. 472,—

"According to the weight of authority, however, the fact that a person voluntarily comes to a nuisance by moving into the sphere of its injurious effect after its creation will not deprive him of his rights to injunctive relief or damages." (Sec. 196.)

"As a rule, it is no justification for maintaining a nuisance that the party complaining of it came voluntarily within its reach. Thus, according to the weight of authority, the fact that a person voluntarily comes to a nuisance by moving into the sphere of its injurious effect, or by purchasing adjoining property or erecting a residence or building in the vicinity after the nuisance is created, does not prevent him from recovering damages for injuries sustained therefrom, or deprive him of the right to enjoin its maintenance, especially where, by reason of changes in the structure or business complained of, the annoyance has since been increased." (Sec. 197.)

It follows that plaintiffs were entitled to have judgment enjoining defendant's continuance of said nuisance. To that end the judgment will be modified so as to provide that defendant is hereby enjoined from operating its coalyard in such

manner that coal dust emanating from its yard can be blown onto the properties of plaintiffs in such quantities as to constitute the nuisance which causes the injury and damages to plaintiffs' houses and the interiors thereof, as stated in the court's fifth and sixth findings of fact.

*By the Court.*—Judgment modified as stated in the opinion and affirmed as modified; with costs to plaintiffs.