MAITLAND and another, Respondents, vs. TWIN CITY
AVIATION CORPORATION, Appellant.

*March 10—April 12, 1949.*

542

For the appellant there was a brief by *Stafford & Stafford* of Chippewa Falls, and oral argument by *Harold E. Stafford*.

*Marshall A. Wiley* of Chippewa Falls, for the respondents.

MARTIN, J.   The first contention of defendant is that the flight of defendant's planes over plaintiffs' mink ranch on May 12, 1947, causing damages, was not an actionable wrong, and that there is not sufficient evidence to warrant the finding that the aircraft flew at a low altitude.

Sec. 114.03, Stats., provides as follows:

"*Landowner's rights skyward.*   The ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath, subject to the right of flight described in section 114.04."

Sec. 114.04, Stats., provides as follows:

"*Flying lawful, landing unlawful; limitations; emergency.* Flight in aircraft over the lands . . . of this state is lawful, unless at such a low altitude as to interfere with the then existing use to which the land, . . . or the space over the land, . . . is put by the owner, or unless so conducted as to be imminently dangerous or damaging to persons or property lawfully on the land . . . beneath. . . ."

The Civil Aeronautics Authority (hereinafter referred to as "CAA") regulates the traffic rules, and the course of taking off and landing from any airport is called the "traffic" or

"flight pattern." The traffic pattern is that all planes taking off must go into the wind. On May 12, 1947, the wind was from the east and, therefore, all planes went east off from the east-west runway located on the south side of the airport. The aircraft goes east until it reaches an altitude of four hundred feet. This altitude is determined by an altimeter which is a gauge in the aircraft. At four hundred feet the aircraft is nearly directly south of plaintiffs' mink ranch. The CAA rules then require the plane to make a ninety-degree turn to the left or north and climb to six hundred feet. The six-hundred-foot altitude would be reached just over and slightly east of the plaintiffs' mink ranch. Upon reaching this altitude, the plane is supposed to make a forty-five-degree turn to the right out of the flight pattern, and is then free to go in any direction. The take-off into the wind and climb to four hundred feet and the ninety-degree turn to the left and climb to six hundred feet is prescribed by the federal traffic rules for all airports in the United States.

Defendant cannot claim the protection of any CAA regulation for the acts complained of constitute violations of these regulations.

The property rights in the airspace do not mean that the landowner must occupy the airspace physically. *United States v. Causby* (1946), 328 U. S. 256, 264, 66 Sup. Ct. 1062, 90 L. Ed. 1206.

The height below which the surface owner may reasonably expect to occupy the airspace for himself is to be determined upon the particular facts of each case. *Swetland v. Curtiss Airports Corp.* (D. C. 1930), 41 Fed. (2d) 929, (6th Cir. 1932), 55 Fed. (2d) 201; *Hinman v. Pacific Air Transport Corp.* (9th Cir. 1936), 84 Fed. (2d) 755, cert. den. (1937), 300 U. S. 654, 57 Sup. Ct. 431, 81 L. Ed. 864.

It is undisputed in the evidence in this case that the property of the plaintiffs was not only endangered and damaged, but a considerable portion thereof was destroyed by the operation

of the planes owned by the defendant. No other cause for the killing of the plaintiffs' mink kits was attempted to be given. Joseph Maitland testified he personally saw the mother mink kill the kits while defendant's planes were flying low over his ranch, and when these mother mink were terrified by the flight. The expert mink breeders testified that a low-flying plane would cause the trouble here encountered. The defendant's pilots knew of the danger from low flying over mink farms, for they maintained a map at the flying field showing the location of each such farm with relation to the airport. Additionally, they cautioned the pilots about the danger to the young mink. The flying was, therefore, illegal since it did not conform to the safety standards of either the state or federal law.

Sec. 60.105 of the civil air regulations (effective August 1, 1945), provides:

"*Minimum safe altitudes.* Except when necessary for taking off and landing, aircraft shall be flown:

"(a) when over the congested areas of cities, towns, settlements, or open-air assemblies of persons, at altitudes sufficient to permit emergency landings outside such areas and in no case less than one thousand feet above such areas, and

"(b) when elsewhere than as specified in paragraph (a), at an altitude of not less than five hundred feet, except over water or areas where flying at a lower altitude will not involve hazard to persons or property on the surface."

Plaintiff Joseph Maitland testified that on May 12, 1947, the light planes took off defendant's east-west runway at the south end of the airport, and flew in the regular flight pattern of flyers practicing take-offs and landings. These planes took off to the east, flew beyond plaintiffs' ranch to the south, turned north and passed the ranch on the east; turned west and passed the ranch on the north; and proceeded to complete the pattern by turning south, west of the airport and then east again in order to land on the runway and take off again to repeat the pattern. As at least three of the planes continued

their flight, the pilots cut the pattern shorter and shorter and flew lower and lower. At the time he went down to the airport to protest, the planes were flying over his ranch at an altitude of one hundred to one hundred fifty feet. He based his estimate of height on the trees and the distance above the trees. He testified further that for a period of about an hour, their altitudes ranged from eighty feet to four or five hundred feet.

Mr. Buttenhoff, whose land adjoins the Maitland farm on the south, testified that he saw three planes flying over the Maitland ranch between six and seven o'clock. He did not give an estimate of their height in feet, but he did testify that, "they were not very high. Judging from the trees around there you can pretty near judge how high they are."

The defendant has relied upon the testimony of the pilots whom he claims are disinterested witnesses. However, they are not, for violations of CAA regulations can lead to the imposition of penalties by the CAA.

Defendant also claims that the testimony of these pilots as to the altimeter reading definitely establishes the altitude at which the planes were flying over the ranch. The evidence shows that this instrument must be adjusted for the particular airport and readjusted to zero after each landing. Whether they looked at the altimeter and what the altimeter registered at the particular moment when they were over the ranch is a question of fact. The pilots testified that they did not fly over plaintiffs' ranch at all the afternoon of May 12, 1947, or not at an altitude of less than five hundred feet. This testimony is contradicted by the testimony of Mr. Buttenhoff and Mr. Maitland, and is further contradicted by the wholesale destruction of the kits due to the extreme fright of the female mink.

The question of credibility of witnesses is under all ordinary circumstances for the trial court. *Will of Kalskop* (1938). 229 Wis. 356, 281 N. W. 646, 282 N. W. 587.

Defendant's next contention is that the plaintiffs located their mink farm near defendant's airport after it had been in operation for many years, so they appreciated the dangers and assumed the risk thereof.

It is true that the airport was in existence at the time the plaintiffs purchased their farm in the fall of 1945. Mr. Maitland noted the distance and was satisfied that normal operations at the airport would not affect a mink ranch. The only flight pattern which carries planes close to the ranch is the one when planes are taking off to the east. If the planes followed the civil aeronautics regulations, their altitude would be such that it would not affect the lawful use by plaintiffs of their land. Furthermore, the plaintiffs had talked to defendant's officers about prior violations, and attempted to stop the low flights on May 12th as soon as they occurred. As stated previously, the defendant's pilots were aware of the location of the mink farm.

There is no evidence that plaintiffs assumed the risk or contributed to the loss occasioned by defendant's planes flying at an unlawful altitude over plaintiffs' property and, therefore, the many cases cited by defendant relating to assumption of risk and contributory negligence are distinguishable.

Defendant has also cited *Amphitheaters, Inc., v. Portland Meadows* (Or. 1948), 198 Pac. (2d) 847, and Restatement, 4 Torts, p. 491, sec. 893, on the subject of "Voluntary exposure to risk as a defense."

In the present case there are state and federal laws regulating the airport's operations. Had the safety standards of these laws not been violated, there would not have been a loss to plaintiffs' property.

Defendant asserts further that the damages and liability are based on speculation.

Maitland testified, pen by pen, as to the classification of the female mink, the breeding date, the number of the litter, and the amount found after the flight. The value of the various

classes of pelts was established by market prices for that year. Two expert mink ranchers testified as to their opinion of the value of newborn kits, and the value of the female mink as breeders. These experts, together with Mr. Maitland, testified as to the acceptance of the mink-ranching practice of determining the size of a litter from the chorus of mews, and of the policy of disposing of those female mink which have destroyed their litter. They offered competent testimony as to the value of these female mink as breeders and as to the percentage of male and female kits.

As stated earlier in this opinion, the evidence is not uncertain as to the cause of the damages. Maitland testified to seeing personally the fright of the mother mink and the destruction of the kits. It was not explained by any other cause.

The fact that the full extent of the damages in torts must be a matter of uncertainty is not ground for refusing damages. In such cases plaintiff is not denied all right of recovery and the amount is fixed by the court in the exercise of sound discretion. See 25 C. J. S., Damages, p. 494, sec. 28.

It is our conclusion that the plaintiffs' damages as determined by the court are amply sustained by the evidence.

The final question relates to the injunction granted by the trial court which enjoined defendant from flying at less than five hundred feet altitude over the plaintiffs' five-acre mink ranch during the period from April 25th to June 25th each year.

The prayer for injunctive relief is addressed to the sound discretion of the trial judge. It should not be granted where the inconveniences and hardships caused outweigh the benefits. It should only be granted where there is an irreparable injury. See 28 Am. Jur., Injunctions, p. 399, sec. 16; p. 412, sec. 231; p. 426, sec. 244.

The relief here granted prohibits the defendant from flying its planes below five hundred feet during the mink-whelping season. Under CAA regulations, planes should be at a height

of five hundred feet or over when over plaintiffs' mink farm. The injunction restrains defendant from doing that which is already prohibited by flying regulations. There can be no serious hardship or inconvenience to the defendant.

The flight pattern at the airport is such that it is unnecessary for defendant's planes to operate over plaintiffs' mink farm lower than the height required by the court's order.

The testimony establishes, as found by the learned trial judge, that the damages suffered by the plaintiffs are difficult to ascertain. The loss in kits is in excess of the minimum which can be reasonably established by the evidence. In addition, there is the loss of putting the plaintiffs two years back in their breeding program.

The cases cited by defendant in each instance bar or hinder ordinary flying. Here no claim is made that legal flying, or flying within regulations, is a nuisance.

The granting of the injunction is proper. See *Gitlitz v. Plankinton Building Properties, Inc.* (1938), 228 Wis. 334, 280 N. W. 415; *Kuehn v. Milwaukee* (1892), 83 Wis. 583, 53 N. W. 912; *Kimberly & Clark Co. v. Hewitt* (1890), 75 Wis. 371, 44 N. W. 303; 28 Am. Jur., Injunctions, p. 216, sec. 23 *et seq.*

*By the Court.*—Judgment affirmed.