BELL, Respondent, vs. GRAY-ROBINSON CONSTRUCTION COMPANY, Appellant.

*January 6—February 2, 1954.*

For the appellant there was a brief by *McLeod & Donohue,* and oral argument by *Kenneth McLeod* and *Raymond R. Colwin,* all of Fond du Lac.

For the respondent there was a brief and oral argument by *Ervin A. Weinke,* attorney, and *James M. George* of counsel, both of Fond du Lac.

FAIRCHILD, C. J.   The controversy here involves the liability of a construction company for damage caused by its agent's acts to valuable property. The property affected consisted of live mink, which were, at the time of the incident in the extremely nervous state peculiar to them at the whelping season. At that time, mink, if disturbed by unusual noises, destroy their young, and they themselves, if they survive, either die, or undergo changes in nature which result in their becoming cannibalistic so that they are no longer suitable as breeders. The fact that the mink were lost to plaintiff as breeders was especially important because at the time of the incident he was engaged in changing from dark to mutation mink, and all but five of the mink kits and all of the adult mink were of the light varieties which plaintiff needed as breeders for his mutation program. The defendant's agent, in performing his work, was using a power shovel, which, in its operation, caused an unusually loud noise. The sound was carried by the wind to some of the pens housing the mink. The mink became excited and

began to run. When plaintiff noticed that the mink were being seriously affected, he spoke to defendant's agent, explaining the danger to which his property was being exposed, and asked to have the sound reduced. It was then agreed to try running the machine at "half-throttle." After observing the animals for ten to fifteen minutes while the machine was being thus operated, plaintiff notified the defendant's agent that the mink were still in a state of excitement and insisted that the only effective remedy would be to put a muffler on the machine. Defendant objected to doing this, saying his machine was not the type to be fitted with a muffler and that if one were put on, his machine would be damaged. Thereupon he continued to run the machine for an hour and a half, or until noon of June 5, 1951, when work was discontinued for that day and the machine was shut down. The next day, the defendant's agents installed an improvised muffler and continued operations without affecting the mink. In the meantime, however, the damage had been done. During the hour and a half which intervened between the time plaintiff gave second notice and the time the power shovel was shut off at noon, 87 mink kits and 15 adult mink breeders were destroyed or made useless as breeders.

The two causes of action set forth in the complaint, at first blush, seem to cause some confusion. However, we take the position that the nomenclature does not control. In his written decision, the trial court said:

"It appears from the record that the plaintiff, in his complaint filed herein, relies on two causes of action. The first cause alleges facts which are relied upon as constituting a nuisance; and the second cause of action sounds in negligence. . . . the court is of the opinion that the finding of negligence on the part of the defendant operator of the shovel is fully supported by evidence, and that an issue was raised for jury determination, which this court must uphold, . . ."

The substantive wrong of the action here arises not out of any wrongful act of defendant's agent in using a power shovel when and where he used it, but out of the negligent manner in which he proceeded with the operation of the machine after he had been duly notified that the noise of the operation was exciting plaintiff's mink. At the time of the second notice, none of the mink had yet died. Defendant's agent had been apprised and was thus fully aware of the consequences which would result from his continued operation of the machine in the manner in which he was operating it. At this time, defendant's agent had the relative duty, that is, the duty relating to the particular circumstances, to operate his machine in such a manner as to avoid damage to plaintiff. From the facts in the case it is plain that at the critical moment defendant's agent behaved as if he had no duty at all, merely insisting that the use of a muffler was impossible and continuing operations as before. It is also plain from the facts that it was well within his power to exercise the degree of care required under the circumstances to avoid damage, for the precise safeguard requested by the plaintiff, namely a muffler, was installed on the following day, and he was able to proceed with his work without damage to plaintiff's mink.

Nuisance and negligence are different kinds of torts. A nuisance does not rest on the degree of care used, for that presents a question of negligence, but on the degree of danger existing even with the best of care. 20 R. C. L., Nuisances, p. 381, sec. 3. To constitute a nuisance, the wrongfulness must have been in the acts themselves rather than in the failure to use the requisite degree of care in doing them, and therein lies the distinction under the facts of this case between nuisance and negligence. The one is a violation of an absolute duty; the other a failure to use the degree of care required in the particular circumstances—a violation of a relative duty.

The principle governing here found expression in the opinion of this court, where Mr. Justice PAINE, in the case of *Foshay v. Glen Haven,* 25 Wis. 288, ruled that objects within the limits of a highway naturally calculated to frighten horses of ordinary gentleness may constitute such deficiencies in the highway as to render the town liable even though so far removed from the traveled path as to avoid all danger of collision. In the case of *Berg v. Auburn,* 140 Wis. 492, 122 N. W. 1041, it was ruled that the town authorities had the right to deposit material in the highway at convenient and proper places for the purpose of repairing the same in the exercise of ordinary care, but they had no right to place such material so as to render highways dangerous to travelers and permit it to remain an unreasonable time. In the case of *Carlon v. Greenfield,* 130 Wis. 342, 110 N. W. 208, in an action for injuries caused by material deposited in a highway by a contractor engaged to repair a culvert, it appeared that the material consisted of boards, planks, barrels, and a mortar box with a coating of dry, white material, placed on top of the other material so as to elevate it about three feet, all placed within about two feet of the traveled track. It also appeared that the material could readily have been placed along the margin of the highway, near a fence, some 20 feet distant from the traveled track. It was held that a jury question existed.

There was no assumption of risk by the plaintiff Bell. He had a right to have his mink farm where he had it. He had operated his ranch for fourteen years in the same place without damage to his mink. Ordinary highway noises did not disturb them. The same machine involved here had operated in the vicinity a few days before without causing disturbance to the mink. On this day, however, the wind was blowing in such a way as to become a factor in bringing the loud noise to the mink. Plaintiff promptly notified defendant of the danger threatening the mink under these

particular circumstances. However, defendant's agent failed to act in accordance with his relative duty to avoid damage under the particular circumstances and therefore the wrong which caused the damage to the plaintiff is based upon negligence. The jury found the defendant negligent in the manner in which the power shovel was equipped during its operation with respect to the use of a muffler. The finding of the jury is against the defendant.

A review of the instructions shows that the court sufficiently outlined the matter for the jury under a cause of action for negligence, and that there was, therefore, no prejudicial error resulting.

As to the amount of damages. In determining the amount of damages, the jurors should proceed upon the description of the subject as they find it from the testimony, and they should avail themselves of such aid as is afforded them in the opinions of witnesses as to values of property involved. Their findings may be more or less in amount than as stated by any witness. Where there is a legal measure of damages, the jury must determine the amount as a fact according to that measure; and whether they have done so or not in a given case may be proximately seen by a comparison of the verdict with the evidence. See 1 Sutherland, Damages (4th ed.), p. 2, sec. 2; 2 Sutherland, Damages (4th ed.), p. 1479, sec. 456.

The testimony of the plaintiff is that 87 of his mink kits died because of noise from appellant's machine operated near his mink farm; that of these 87 kits, five were of the dark variety, 45 of the Breath of Spring variety; 37 of the Pastel variety. In addition, he testified, he lost three full-grown Pastel female breeders having no pelt value; three full-grown Breath of Spring female breeders having no pelt value; and that nine Pastel female breeders were rendered useless as breeders because fright had made them cannibalistic so that they had to be pelted out.

Plaintiff concedes that one and one-half per cent to two per cent of the kits would have died from natural causes; and that five out of the 87 would have been unsuitable for breeding purposes.

It is stipulated that 55 per cent of the kits were male; 45 per cent female.

There was expert testimony on the value of the mink and also on the policy of disposing of the mink which have destroyed their litter.

Because respondent testified that under normal operations, —such as those under which he was raising all dark minks for the main purpose of selling their pelts—at pelting time, in November, he was in the habit of retaining 300 mink for breeders, and that of this 300, 40 were replaced by young kits born the following June, appellant has concluded from this testimony that only 40/300, or 2/15 of the kits destroyed by the noise of appellant's machine would have been kept by respondent as breeders. Appellant has taken the loss of each variety separately, deducted two from each of the light varieties as having died from natural causes, and separated each class into males and females on the stipulated formula of 55 per cent and 45 per cent. He has further divided the males and females into breeders and pelters on the basis of 2/15 normally kept for breeders. He has then applied the lowest value set by respondent to the male breeder, the male pelter, the female breeder, and the female pelter. He has deducted the cost of feeding based on plaintiff's testimony, and has arrived at a net loss of $3,100.50.

In giving the testimony from which appellant derived the 2/15 proportion, respondent was referring to a normal year. But the year 1951 was not a normal year. Respondent testified: "I wouldn't say that it was a normal year, because it was while we were converting our yard for mutation." In other words, respondent was engaged in changing his stock from the dark variety to the lighter varieties in order,

eventually, to get the lighter and higher-priced pelts. He says: "In a case where I would want to change to a different breed, I'd try to keep nearly everything I could." And again: "I'd have to keep more of them [the light varieties] to mate with my dark ones to get mutations." It is therefore clear that the respondent did not intend to maintain for the year 1951 his normal apportionment of kits into breeders and pelters, that is, the proportion of 40/300.

Expert testimony established that a breeder has a greater value than a pelter. Therefore, if, as respondent testifies, he would have kept more than 2/15 of the kits, his loss would be proportionately higher than that figured by appellant on the 2/15 basis. Following the outline of appellant's chart and basing the apportionment of the kits which respondent would have kept as breeders on evidence rather than on the unrealistic and wooden basis of 2/15, and using the values set down in appellant's chart, the amount of loss could fairly have been determined as follows:

Out of the 87 kits lost, five were of the dark variety. Respondent concedes that of these he probably would have kept no breeders: "Of the dark mink that died, I probably wouldn't have kept any of those." The loss from the dark mink, therefore, is to be based entirely on their pelt value. Since, upon stipulation, 45 per cent of the kits were female and 55 per cent male it can be considered as a practical matter that there were two females and three males. Appellant's accepted value of the male pelts was $28.50 apiece; of the females $13. The loss on the dark variety would then be:

| | |
|---|---:|
| 3 male pelts @ $28.50 | $85.50 |
| 2 female pelts @ $13.00 | 26.00 |
| Total | $111.50 |

As to the Breath of Spring variety, respondent testified: "Well, out of the Breath of Spring, I didn't have to try to

keep so many of them; I wouldn't have had to for the fact that I was coming along, I had more Breath of Spring than I would have had of the Pastel." The testimony shows that respondent had, in fact, after the destruction of the kits in June, 1951, 100 of this variety of mink; whereas, after the destruction of the Pastel kits on that date, respondent did not have a single Pastel left on his farm. The total number of the Breath of Spring kits destroyed was 45. Subtracting one because of natural death would leave 44. Out of the 44, on the 45 per cent-55 per cent formula, there would be 24 males and 20 females. Because respondent was "coming along" with this variety and "didn't try to keep so many of them," the normal proportion of 2/15 might be applied to determine the number kept for breeders. Thus 2/15 of 24 male breeders would be three male breeders; 2/15 of 20 female breeders would be three female breeders. There would be left 21 male pelters and 17 female pelters. The loss would then be:

| | |
|---|---:|
| 3 male breeders @ $125 | $375 |
| 3 female breeders @ $60 | 180 |
| 21 male pelters @ $46 | 966 |
| 17 female pelters @ $23 | 391 |
| Total | $1,912 |

The greatest misapplication of the 2/15 proportion by appellant was in relation to the Pastel variety. There is no evidence or testimony to support the fact that respondent would have kept only 2/15 of the kits of this variety as breeders. The testimony is entirely to the contrary. Respondent testified that he would have kept all of this variety of kits that he could have for breeders. It is reasonable to believe that this was true, in view of the fact that the Pastels were the variety of which respondent had the least

number and that he was particularly desirous of increasing and improving his stock of Pastels. The number of Pastel kits destroyed was 37. Subtracting one because of natural death would leave 36. On the 45 per cent—55 per cent basis there would be 20 males and 16 females. In this class, according to testimony, all would be kept as breeders. The loss on the Pastels would then be:

| | |
|---|---:|
| 20 male breeders @ $100 | $2,000 |
| 16 female breeders @ $75 | 1,200 |
| Total | $3,200 |

In addition to his loss of kits, respondent suffered a loss of 15 full-grown female breeders as follows:

| | |
|---|---:|
| 3 full-grown female Pastel breeders (no pelt value received) @ 75 | $225 |
| 3 full-grown female Breath of Spring breeders (no pelt value received) @ 60 | 180 |
| 9 full-grown female Pastel breeders @ 75 | 675 |
| | $1,080 |
| Less pelt value received for 9 female Pastel breeders | 207 |
| Total loss on full-grown breeders | $ 873 |

The total loss thus far figured, then, is:

| | |
|---|---:|
| Loss on dark variety kits | $ 111.50 |
| Loss on Breath of Spring kits | 1,912.00 |
| Loss on Pastel kits | 3,200.00 |
| Loss on full-grown breeders | 873.00 |
| Total | $6,096.50 |

This figure must be modified by subtracting an average of two from the Pastel breeders conceded by respondent to be unsuitable for breeding and substituting their pelt values.

```
2 Pastel breeders at an average value of  $175.00
2 Pastel pelters at an average value of      74.50
                                          _____
                                          $100.50  $6,096.50
                                                      100.50
                                                   _____
Total  .........................$5,996.00
```

The court instructed the jury to apportion to respondent the cost of feeding. According to the testimony this cost was $6 per kit for six months. There were 54 minks to be fed until pelting time. Subtracting $324 for feed and care, the net total loss would be:

```
                                                   $5,996
                                                      324
                                                   _____
Total net loss.......................$5,672
```

We hold that the verdict as rendered by the jury is sustained by the evidence and that the judgment must be affirmed. *Maitland v. Twin City Aviation Corp.* 254 Wis. 541, 37 N. W. (2d) 74.

*By the Court.*—Judgment affirmed.