(No. 4672–)

DAVID CERAR AND JOSEPH CERAR, d/b/a CERAR MINK RANCH, Claimants, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed January 8, 1957.*
*Petition of claimants for rehearing denied April 26, 1957.*

JOHN W. RUSSELL, Attorney for Claimants.

LATHAM CASTLE, Attorney General; C. ARTHUR NEBEL, Assistant Attorney General, for Respondent.

FEARER, J.

Claimants, David Cerar and Joseph Cerar, d/b/a Cerar Mink Ranch, filed their claim against the State of Illinois for damages in the amount of $5,795.00.

They allege in their complaint the loss of 105 mink "kits", approximately one week old, which were destroyed by a female mink on May 16, 1954, and charge that on said date at or about the hour of 1:15 P.M. members of the 170th Fighter Bomber Squadron, Illinois Air National Guard, flew F-51 Fighter planes, approximately five in number, at a low altitude within the vicinity of Carlinville, Macoupin County, Illinois.

The evidence shows that the mink ranch, which was operated by plaintiffs, was located one-half mile south of Carlinville, Macoupin County, Illinois, and the whelping season for the mink at the ranch had been within one week prior to said date. Furthermore, it pointed out that mink are highly nervous, and at whelping time if the mother mink becomes disturbed or excited she destroys her young by eating them, or killing them in other ways.

No answer having been filed to the complaint, a general traverse or denial is considered to have been filed.

The record consists of the following:

Complaint.
Transcript of evidence.
Departmental Report.
Various and sundry motions in regard to extensions of time for filing abstracts and briefs.
Abstract of evidence.
Statement, brief and argument of claimant.
Statement, brief and argument of respondent.
Reply brief.
Commissioner's Report.

Claimants offered several witnesses, who testified in substance that on the day in question they heard the roaring of planes, and identified them as being of the fighter class. They stated the planes were flying low in the vicinity of the mink ranch, and that the roar from the planes created and caused vibrations on the ground, and attracted the attention of several people. In this regard, some of the people did not state the altitude at which the planes were flying, and others disagreed as to the altitude at which the planes were flying in the vicinity of the mink ranch. One of the claimants, David Cerar, his wife, and a Mr. and Mrs. John Hargis, who were at the mink ranch on the day in question buying mink feed from one of the claimants, all testified that they heard the roaring of the planes, felt the vibrations, and identified the planes as being F-51 Fighters, at a time when at least Mr. Cerar and Mr. Hargis were in a freezer, which was heavily insulated, selecting the feed being purchased by Mr. Hargis. They immediately ran out and noticed the F-51 planes, being aproximately five in number, which were following a tow plane to which a sleeve had been attached as a target for the other planes.

It was established by the Departmental Report, among other things, that Camera Gunnery Missions of

the Squadron in question were normally performed in an area west of Mason City, Illinois, but, due to inclement weather in that area on May 6, 1954, an area south and west of Springfield, Illinois was used. In the mission a sleeve is towed by an aircraft as a target for the other planes. The aircraft fly in a circular motion diving toward the sleeve, and, when the triggers are tripped, the camera operates, and records the proficiency of the pilot. The tow aircraft is flown at 2000 feet mean sea level. Full power is used in the F-51 type aircraft, which is the accepted practice on such missions. These aircraft at maximum power create a roar, and establish a vibration.

The statements of several pilots and other personnel, which were attached to the Departmental Report, gave the location of the mission as being as far south as Girard, Illinois, and expressed the belief that they were in the area of Carlinville.

David Cerar, his wife, and Mr. and Mrs. Hargis testified that, upon hearing the roar and noticing the planes, they saw the mother mink drag the baby mink "kits", and saw other evidence of destruction of the mink "kits".

David Cerar and one other witness testified on his behalf in arriving at the number of mink "kits" destroyed. David Cerar testified from his records as to the number of mink "kits" destroyed by mink, all of which is reflected by the Bill of Particulars, attached to the complaint and made a part thereof.

Respondent, under Point One of its brief, contends that, in the absence of knowledge of the location of the mink farm, there is no liability for damages for loss of young resulting from fright caused by low flying, citing the following cases:

*Nova Mink, Ltd.* vs. *Trans-Canada Airlines,* 1951 U.S. Av. R. 40.
*Maitland* vs. *Twin City Av. Corp.,* 37 N.W. (2d) 74, 254 Wis.
541.

Claimants have cited the case of *Thomas Lee Causby* vs. *United States of America.* This is a decision of the United States Court of Claims, in which it was held that the operation of an airport by the United States Air Force constituted a taking of the property of the claimant, Causby, for which he was entitled to compensation.

We are here being called upon to decide whether respondent's agents were negligent in the operation of the planes in causing a roar and vibration, which would frighten the mink, and cause them to destroy their young.

In this regard, we have to take into consideration: First, whether or not the agents could foresee the consequences of their acts in the flying of the aircraft during a gunnery mission, which would give rise to the claimants' claim against respondent; Second, whether the pilots were flying in a restricted area or were confined to a particular area in carrying on a gunnery operation; and, Third, whether or not they were flying at the required altitudes set forth in the Rules and Regulations of the Civil Aeronautics Commission and the Department of the Air Force of the United States Government.

Section II of the Rules and Regulations of the Air Force of the United States, being General Flight Rules and Requirements, appears as a part of the Departmental Report, and reads as follows:

"12. Minimum Altitude of Flight. Except during take-off and landing, no aircraft will be flown:

a. Over a metropolitan area, town, congested area, or open air assembly of persons except at an altitude, which will permit an emergency landing outside of such areas in the event of mechanical malfunction. In no case will the altitude over such areas (except when necessary to execute established landing

or take-off patterns) be less than 2,000 feet above the highest obstacle within a radius of 2,000 feet from the aircraft.

b. At an altitude of less than 500 feet above any building, house boat, vehicle, or other obstruction to flight.

c. At less than 500 feet above the ground or water elsewhere than as specified above, except that helicopters may be flown at less than 500 feet at places other than enumerated in *a* and *b* above."

A description of a Camera Gunnery Exercise, prepared by Major Robert J. Spreit, is attached to the Departmental Report, wherein a complete explanation of gunnery missions of this kind is given. In his statement, Major Spreit admitted that he was flying the aircraft, which was towing the aerial target, and that there were three other F-51 aircraft in the flight making camera gunnery passes on the target he was towing. He reported he was towing the target at 2000 feet mean sea level, and that none of the aircraft went below this altitude during the Camera Gunnery Exercise. The aircraft do not fly below the target, but at all times, after firing the target, climb above it to make their getaway. He testified as to the area in which the mission was executed, and stated that at no time did he pull the target over a populated area.

There appears to be no question but what, even though the planes were flown at a recognized altitude, they would still create a roar and certain vibrations, which would certainly attract the attention of people. This would also be true of any aircraft, such as jet planes, which are becoming quite common, flying in formation or on a mission over populated areas, and undoubtedly over other mink ranches during the period of time when the mink were whelping and undoubtedly would frighten them, which would cause them to destroy their young, as was testified to in this case.

In fact, there is testimony that strangers appearing at a mink ranch during a period of time when the mink are having their young, or any unusual noise made by a passerby, might cause the mink to become frightened and destroy their young. In these instances, we do not believe that the making of a noise without any knowledge or ability to see the consequences of same would create any liability against the individual. We do not see why the same reasoning could not be applied to the instant case. We believe that it would be placing respondent and also the United States Air Force under a responsibility, which would be unreasonable at a time when we are trying to maintain and strengthen the defenses of this country, in which it is recognized that the Air Force plays a very material part.

The cases cited by both claimants and respondent are certainly in conflict. We do believe that there is a lot to be said about the questions of knowledge, of foreseeability, and the consequences of acts of this nature before there can be any question of liability.

There is also a responsibility upon mink ranchers to so conduct and provide for mink during the time that they are whelping, so as to minimize their loss.

Under the circumstances, we do not feel it necessary to make a comparison, or to draw conclusions as to the discrepancy between the Departmental Report and the testimony of claimants' witnesses as to the altitude maintained by the planes, and the distances the planes were from the mink ranch owned by the claimants.

The record is silent as to any disciplinary action initiated against the pilots, who were flying under their Commanding Officer, for a violation of any rule or regulation of the Civil Aeronautics Commission or the Air

Force of the United States Government. It is further recognized that the training and experience acquired through such missions is necessary, and, of course, at times could be frightening to animals. Certainly all these possibilities could not be a resulting consequence, and could not be chargeable to pilots flying on a gunnery mission or any other mission during flight training.

We, therefore, believe that this claim should not be allowed. To make any other decision would be a departure from the rules and principles, which we have formerly laid down in cases involving negligent or tortious acts.

## SUPPLEMENTAL OPINION

The claim in the above entitled cause having been denied by this Court, claimants filed a petition for rehearing on February 6, 1957. Oral argument was had on March 22, 1957.

It has been alleged in the petition and argued, first, that this Court gave greater weight to the Departmental Report than to the testimony of eleven eye witnesses concerning the actions of the five planes of the 170th Bomber Squadron of the Illinois National Guard. In this regard, petitioners are of the opinion that, because the Departmental Report is not sworn to, and claimants did not have an opportunity to cross-examine the witnesses, this Court should not consider the matters set forth in the Departmental Report. In reply to this, we refer to Rule 16 of the Court of Claims.

In the second paragraph of the petition, claimants contend that it would be unreasonable and impossible for claimants to give notice to the Federal and State

Governments, where air bases are maintained within flying distances of ranches, as to their location.

In reply to this, we held and are of the same opinion that, before there could be any liability established, and before we could allow a claim of this nature, claimants would have to prove by a preponderance or greater weight of the evidence that the consequences of the acts of the agents would have to be foreseeable. This, we believe the claimants have failed to establish.

The third point raised is that the Court overlooked the fact that, had the planes been flying in accordance with the Rules and Regulations of the Air Force of the United States, the loss of 105 mink kits would not have taken place; and the preponderance of the evidence was that the said planes were at a much lower altitude, and the question of foreseeability and the consequences of the acts must be based on the reasonableness rule. (Citing the case of *Skeets* vs. *U.S.A.*, 1947 U.S.A. Reports, 337.)

There was no evidence that, had the planes been flying at 2,000 feet or more, the noise and vibrations would not have still excited the mink resulting in the damages claimed. Furthermore, we are of the opinion that the planes were flying at more than the recognized height, which is 500 feet outside of city limits, and that we have adopted the reasonableness rule that the consequences of these acts would not be foreseeable by the pilots flying the planes in question.

The fourth paragraph of the petition calls attention to our misapprehension as to the findings in the *Nova Mink Ltd.* vs. *Trans-Canadian Air Lines* case, 1951 U.S. Av. R. 40; and the *Maitland* vs. *Twin City Av. Corp.*, 37 N.W. (2d) 74, 254 Wisc. 541.

535

We have re-examined the record in this case, and find from the testimony of some of the witnesses that they were unable to state the height at which the planes were being flown. We are also of the opinion that the pilots in question did not fly their planes contrary to general safety rules and regulations.

If we had found that the pilots had exceeded their authority on this mission, and were acting outside of the scope of their authority in defiance of their rules and regulations, we would have also denied this claim.

As to paragraph five of the petition, we have taken into consideration all of the facts and circumstances in arriving at our decision, and are still of the opinion that this claim should be denied.