KELLOGG, Respondent, v. VILLAGE OF VIOLA, Appellant.

*No. 233.  Argued March 3, 1975.—Decided March 28, 1975.*
(Also reported in 227 N. W. 2d 55.)

For the appellant there were briefs by *Kramer, Nelson & Azim* of Fennimore, and oral argument by *John Kramer.*

For the respondent there was a brief by *Hale, Skemp, Hanson, Schnurrer & Skemp* of La Crosse, and oral argument by *John Kellogg.*

WILKIE, C. J.    The village of Viola operated a private nuisance where burning was done at the village dump. John Kellogg, the plaintiff-respondent, operated a mink ranch on land purchased in 1966 from the village and located directly adjacent to the village dump. The village appeals from a jury verdict awarding $10,153 to Kellogg for smoke-caused damage to his mink herd during 1970. On this appeal the village claims that in this action by Kellogg for damages attributable to this private nuisance, the plaintiff is barred from recovery because (1) he came to the nuisance, (2) he made representations to the village board which rendered him equitably estopped

from suing, and (3) the mink are abnormally sensitive animals. We reject all of these contentions and affirm.

The basic facts are not in dispute. In 1951 the village of Viola purchased land in lot 27 near the Kickapoo River in Vernon county and began to operate a dump at the site. The operation included the open and often unsupervised burning of trash by private citizens as well as by village employees. In 1965, because of space limitations and department of natural resources regulations, the village purchased all or a portion of lots 15 and 16, directly adjacent to lot 27 to the north, for the purpose of creating a new dump site. After this purchase, but before the dump operations were actually transferred to the new area, the village sold portions of lots 15 and 16 to the plaintiff, John Kellogg, for use as a mink ranch. The board had bought more land than it thought it could use.

Plaintiff approached the village treasurer and said he wanted to buy land for a mink ranch. The treasurer said the village had some land it might sell, and subsequently plaintiff contacted other members of the village board. The board considered the matter at a general meeting and again at a special meeting called at plaintiff's request to consider the land sale. At the special meeting in July of 1966 the board members voted to sell portions of lots 15 and 16 to plaintiff and further, to grant him a mink ranch permit if he could establish that the water well on the property would be sufficient to meet his needs. (Plaintiff was subsequently granted the permit.) The question of whether the proximity of the dump would be harmful to the mink was raised at the meeting, and plaintiff said he did not "think it was a problem." Members of the village board agreed that plaintiff had made such a statement.

Plaintiff started mink ranch operations on lots 15 and 16 in the fall of 1966. In the spring of 1967 the village moved the dump to lot 16 from the old site at 27. The dump and the mink ranch apparently peacefully coexisted until the summer of 1969 when smoke from the dump allegedly caused the loss of 600 mink kits. This incident is not involved in the instant action. Following the loss, plaintiff told several members of the board that he "had a problem" due to smoke from the dump and that "maybe next year we can work something out so we don't have this loss." In the spring of 1970, plaintiff made a verbal request followed by a written request on April 9th that the burning cease during the mink breeding season. The burning stopped for three days and "no burning" signs were placed at the dump. However, the moratorium was ended by an April 22nd decision of the board upon the recommendation of the village employee in charge of the dump. He stated: "I felt that if we wasn't going to burn it, were going to be buried in it . . . ." On approximately May 1, 1970, plaintiff secured a temporary injunction against further burning. The order granting such relief is not in the record, and there are no precise dates listed anywhere indicating its duration. It was apparently dissolved before the smoke damage complained of here since plaintiff does not claim defendant violated any court order.

On Sunday, May 10, 1970, the mink pens were filled with heavy smoke from the village dump, causing the mother mink to become so excited they began killing their young. Plaintiff lost 2,500 mink kits as a result. Another fire occurred lasting from June 8th to June 10th, also causing great excitement of the mother mink. They refused to eat and neglected their young during a critical growing period, resulting in stunting of growth of ap-

proximately 3,000 mink. Several witnesses present at the mink ranch testified that smoke from the May and June fires caused coughing and watering of their eyes. One witness, an employee of plaintiff's, said that the smoke in the mink pens was so bad he could no longer work in there. Another employee, an eighty-year-old man, said the smoke made him sick and as a result he quit the job. There is no indication in the record who started the May and June fires.

## Coming to the nuisance.

There is no dispute that plaintiff came to the nuisance. The dump had been operating since 1931 and, although its exact location changed after the plaintiff purchased his property, he was aware of the impending change which involved only a short move. The first question on this appeal is whether the fact that plaintiff came to the nuisance bars this action in which plaintiff seeks damages for the operation of a private nuisance. It does not. While coming to the nuisance may properly be considered while weighing the equities in an abatement action, it is irrelevant in a damage suit.[1]

Just because it happened that the village landowner arrived in the area first and maintained a nuisance on this property, this does not grant to the village a per-

[1] *Dolata v. Berthelet Fuel & Supply Co.* (1949), 254 Wis. 194, 36 N. W. 2d 97; *Schneider v. Fromm Laboratories, Inc.* (1952), 262 Wis. 21, 53 N. W. 2d 737; *Hartung v. Milwaukee County* (1957), 2 Wis. 2d 269, 86 N. W. 2d 475, 87 N. W. 2d 799; *Costas v. Fond du Lac* (1964), 24 Wis. 2d 409, 129 N. W. 2d 217; *Abdella v. Smith* (1967), 34 Wis. 2d 393, 149 N. W. 2d 537; *Jost v. Dairyland Power Cooperative* (1969), 45 Wis. 2d 164, 172 N. W. 2d 647.

petual easement to pollute the air over all surrounding lands.

### Estoppel.

Coming to the nuisance and estoppel are somewhat related as the trial judge concluded. The difference is that coming to the nuisance embraces action by only one party. Kellogg came to the burning dump nuisance as operated by the village. Estoppel involves the conduct on the part of at least two parties: The party asserting the operation of equitable estoppel, the village, and the party whose claim is sought to be estopped—the mink rancher. The doctrine of estoppel is grounded in basic principles of justice and where applicable, can bar a party from asserting legal or equitable rights.[2]

The elements of equitable estoppel have been frequently stated by this court, most recently in *Gabriel v. Gabriel:* [3]

"The tests for applicability of equitable estoppel as a defense derive from the definition by this court of such estoppel to be: '. . . action or nonaction on the part of the one against whom the estoppel is asserted which induces reliance thereon by another, either in the form of action or nonaction, to his detriment. . . .' Three facts or factors must be present: (1) *Action or nonaction* which induces (2) *reliance* by another (3) to his *detriment.*" [4]

The elements making the defense of equitable estoppel available would be present in the instant case except for the important fact that the nuisance was obviously increased during 1969 and 1970. The trial court observed:

[2] *See: Milwaukee Structural Steel Co. v. Borun* (1917), 164 Wis. 502, 506, 159 N. W. 811, 162 N. W. 424.

[3] (1973), 57 Wis. 2d 424, 204 N. W. 2d 494.

[4] *Id.* at page 429. *See also:* Restatement, 4 *Torts,* p. 502, sec. 894.

". . . The plaintiff approached the Village Board as to buying a portion of the newly acquired dump site as the site of his new mink ranch. There was some question raised by the Village Board as to whether or not their plans for the operation and expansion of the dump would be consistent with the plaintiff's operation of a mink ranch. The plaintiff was asked whether the smoke would affect his mink and he claims he said he didn't think it would. . . .

" . . .

"The plaintiff, prior to his purchase of the land from the Village, knew of the location and use of the old dump; he knew that land had been acquired for its extension; he knew it was used by the Village of Viola and people in that area; and knew how it was used; he knew that burning and smoke was to be expected from the operation of a municipal dump.

"Regardless of how the negotiations for the acquisition of the land by the plaintiff were instituted, the fact remains that during the course of negotiations with the Village, the Village Board did raise the question of the operation of the dump and how it might affect the plaintiff's mink-ranching activities. The inference must be drawn that the Village Board was satisfied that there would be no problem because they then sold the land to the plaintiff."

However, it is undisputed that while plaintiff bought the land and started the mink ranch in 1966, the dump caused no damage during 1966, 1967, and 1968. During 1969, smoke caused the death of some mink, and in May and June of 1970, substantial losses were incurred as the result of the smoke, giving rise to this suit. It must be noted, too, that prior to these latter losses, plaintiff, orally and in writing, put the board on notice that continued burning during the breeding season was endangering the mink. We therefore conclude that based on these facts—increased level of nuisance and notice of same to

the board—the defendant is precluded from asserting estoppel. An analogous situation was considered in *Dolata v. Berthelet Fuel & Supply Co.,*[5] an action to abate the nuisance of coal dust emanating from a coal yard. Defendant argued it had a prescriptive right to continue polluting but the court disagreed:

". . . plaintiffs contend that defendant does not have a prescriptive right to continue the nuisance created by its present manner of operating its coalyard even though it handled coal prior to the date complained of by plaintiffs, and that the nuisance became much greater because of a considerable increase in the quantity of coal handled by defendant after plaintiffs purchased their homes.

"Plaintiffs' contentions in those respects must be sustained. . . .

" . . .

" . . . in *Behnisch v. Cedarburg Dairy Co.* 180 Wis. 34, 37, 192 N. W. 447, the court said,—

" 'The evidence is quite conclusive that the amount of waste water deposited in the creek in question had been largely increased during the two years immediately preceding the commencement of the action. Such being the case, we do not need to consider whether or not the defendant could acquire a prescriptive right to pollute the waters of the stream in question. If a prescriptive right could be acquired, it must necessarily be restricted to its limits when the period of prescription commenced, even though the right be asserted on behalf of the public. . . . A prescriptive right is not enlarged by the enlarged use during the period of prescription, enjoyed by those who claim it, but is measured by the extent of the use at the commencement of the prescriptive period.' " [6]

Similarly, in the instant case the plaintiff is not estopped from complaining about the village nuisance which significantly increased from 1966 to 1970.

[5] (1949), 254 Wis. 194, 36 N. W. 2d 97.

[6] *Id.* at pages 200, 201.

## Abnormal sensitivity.

Defendant argues that because mink are abnormally sensitive animals plaintiff may not maintain this nuisance action.

There is no question that the sensitivity of the plaintiff is a factor to be considered in deciding whether a nuisance exists. In *Bie v. Ingersoll* [7] this court said:

". . . The activity complained of must create more than an inconvenience, and must be offensive to the person of ordinary and normal sensibilities. The result is not to be measured by its effect upon those of extreme sensibilities."

However, the question whether a nuisance exists must be determined by the trier of fact, in this case, the jury. The jury found in this case that the dump was indeed operated in such a manner as to constitute a nuisance. Part of the trial court's instruction to the jury read as follows:

"You are instructed that the word *nuisance*, as used in this question, means a wrong which arises from the unreasonable or unlawful use by a person of his property, which use produces a material annoyance, inconvenience, discomfort, or harm to the property or person of another. The creation of trifling annoyances or inconveniences does not constitute actionable nuisance. In connection with this question, you will take into consideration the general notions of comfort and convenience ordinarily entertained by an ordinary person possessed of ordinary tastes and susceptibilities, under the facts and circumstances of this case."

Defendant does not complain that this instruction was erroneous, or that it did not allow the jury to take account of the special sensitivities of plaintiff's business, or that a special instruction should have been given

[7] (1965), 27 Wis. 2d 490, 493, 135 N. W. 2d 250.

concerning mink. Defendant is really asking this court to hold, as a matter of law, that injury to mink does not give rise to an actionable nuisance. However, in *Maitland v. Twin City Aviation Corp.*[8] and *Bell v. Gray-Robinson Construction Co.*[9] this court ruled to the contrary. Both cases involved noise as a nuisance which caused the mother mink to destroy their young as in the instant case. In each case the court said the loss resulted from the extreme sensitivity of mink during their breeding season, but in each case recovery for the loss was permitted. Thus, it cannot be said as a matter of law that injury to mink does not give rise to an action for nuisance.

### Golden-rule argument.

During his closing argument to the jury which was not recorded, counsel for the plaintiff gave what was denominated by the trial court as a "golden-rule argument." The trial court described it thusly:

" . . . plaintiff's counsel was telling the jury to put themselves in the position of the [plaintiff] as Vernon county residents. This reasoning was not pursued or elaborated on . . . ."

Although this court has recently frowned on the golden-rule argument as made in a negligence case,[10] the argument as made here was not prejudicial. We agree with the trial court's on-the-spot analysis:

"It is true that Mr. Skemp did make the 'Golden-rule' argument but it was not elaborated on and, other than his one statement or sentence to the jury to that effect,

---

[8] (1949), 254 Wis. 541, 37 N. W. 2d 74.

[9] (1954), 265 Wis. 652, 62 N. W. 2d 390.

[10] *See: Rodriguez v. Slattery* (1972), 54 Wis. 2d 165, 170, 194 N. W. 2d 817.

he devoted the balance of his argument, all of which took approximately thirty minutes, to the actions of the defendant and the damages. The plaintiff was asking for damages in excess of $30,000, and the jury, in the opinion of this court, could have returned a verdict considerably in excess of the $10,153.60 awarded to the plaintiff and there would have been credible evidence to sustain such a larger award. This court is of the opinion that the 'Golden-rule' argument did not have an effect on the award of damages and in view of the fact it was not followed up, or further emphasized by Mr. Skemp, the use of such form of argument, even though improper, was not so clearly prejudicial to the defendant or had such an influence on the deliberations and decision of the jury as to merit a new trial."

*By the Court.*—Judgment affirmed.