KRCMAR, Respondent, vs. WISCONSIN RIVER POWER COMPANY, Appellant.

*September 15—October 11, 1955.*

For the appellant there was a brief by *Brazeau & Brazeau* of Wisconsin Rapids, and oral argument by *Theo. W. Brazeau.*

For the respondent there was a brief and oral argument by *C. E. Macomber* of New Lisbon.

MARTIN, J. Plaintiff is a farmer owning 268 acres of land in Juneau county. In 1949 defendant completed the construction of a dam across the Wisconsin river which created a body of water known as Petenwell lake two or three miles east of the lands in question. Defendant located a dike west of the river.

Plaintiff claimed damages to his land in 1950 by seepage water from the lake, and was paid $1,627.30, giving a receipt therefor and a release in writing "from all claims for damages to crops, cropland, pastureland, and woodlands and from all damages of every kind and nature by reason of injury I have suffered or may suffer to [plaintiff's lands] from seepage waters of the Wisconsin river from Petenwell dam and interference with drainage of said lands for the year 1950."

Late in 1950 defendant constructed long, deep, intercepting ditches outside of the dike in order to catch the water seeping from the Petenwell flowage.

It is undisputed that portions of plaintiff's land were flooded in 1951 and it was his contention that such flooding

was caused by seepage from the Petenwell flowage. Defendant contended that it was due to other causes, such as excessive rainfall and overflowing waters of the Yellow river which follows a meandering course generally north and south about 60 rods west of plaintiff's farm.

The evidence being in conflict as to whether or not the damage sustained by plaintiff was caused by the maintenance of Petenwell dam and as to whether the condition complained of was temporary or permanent, those questions were for the jury and in both instances it found for the plaintiff.

It is unnecessary to recite the testimony in detail. In our opinion there was ample credible evidence to sustain the jury's findings in those respects. A number of witnesses testified that prior to the building of the dam the flooding had not existed and that after its completion plaintiff's lands and those of other farmers in the vicinity were flooded. In 1950 defendant paid for the damages caused thereby, and with respect to the negotiations had with the farmers in that connection, Mr. Thiele, president of the defendant corporation, testified as follows:

"The time immediately following the filling of the Petenwell pond and the dike being new and more porous, allowed a considerable amount of seepage to flow through it—more seepage than the small intercepting ditch that was designed by the engineers at Chicago would carry, and consequently the entire countryside was flooded. We admit we damaged farms in that area and at that time I stated, and I will make that statement again today, that we are willing and anxious to pay for any damages that we do, but real damages, not make-believe damages, and that is the thing I told you at that time. . . .

"*Q.* Did you also tell these people, including the plaintiff, at that or some other meeting that this condition was a temporary one? *A.* I did.

"*Q.* Did you further say that your company, a corporation, and you had had experience in the building of dams and knew

it required some time for the settling of the dikes? *A.* That's right.

"*Q.* And after the dike was fully settled with the aid of some ditches this condition would be corrected, is that right? *A.* That's right.

"*Q.* Did you at that time indicate any length of time that would be required? *A.* I think I told you, I think the condition exists that the first two or three years the seepage does not correct itself entirely, it takes seven or eight years to reach the minimum seepage."

While it is true that Mr. Thiele also testified he believed that the ditch constructed in 1950 had completely corrected the situation, it was for the jury to decide what weight should be placed upon the statement in the light of all the evidence.

So far as the rainfall in 1951 was concerned, there was testimony that it was not particularly heavy, except perhaps in the month of July. The flooding complained of began in early spring of 1951 and continued until about the end of June. In any event, the soil being a sandy loam, plaintiff testified it readily absorbed rain. There was considerable evidence that the Yellow river frequently overflowed its banks and plaintiff stated that in the year of 1938, when there were unusually heavy rains, such an overflow affected his lands but that was the only year in which there was water on his fields traceable to the Yellow river. There was also evidence that in the spring of 1951 the water level of the Yellow river was eight inches lower than in the spring of 1954 when there was no water on plaintiff's land.

The evidence was sufficient to support the jury's finding that the water affecting plaintiff's lands in 1951 came from the Petenwell flowage.

The finding that the flooding was a temporary condition is likewise supported by the record. There was Mr. Thiele's testimony, given above, that in 1950 he considered the condi-

tion a temporary one which would eventually be corrected by the settling of the dike and the construction of intercepting ditches. Plaintiff and other witnesses testified that the seepage and flooding started in the spring of 1950, continued in 1951 and 1952, but that at the time of trial in April, 1954, there was no water on plaintiff's farm.

The evidence, however, fails to support the jury's findings as to damages.

Plaintiff was awarded $1,015 for the loss of crops. It appeared on the trial that 20 acres of cropland had been affected. Of that, a number of acres were not planted in 1951 because plaintiff could not get on the land to work it. The proper measure of damages for such acreage, and the court so instructed the jury, was the fair rental value of the land. *Garrett v. Haworth* (1938), 183 Okla. 569, 573, 83 Pac. (2d) 822.

Plaintiff testified that four of the 20 acres had been planted in clover and timothy in 1950. He was asked:

"*Q.* Was that destroyed as a result of water in 1950 and 1951? *A.* Yes, sir. . . ."

Plaintiff gave his release from all claims for damage to crops and cropland "I have suffered *or may suffer*" from seepage waters and interference with drainage of the land for 1950. There is no explanation in the record as to the amount of damage to the hay crop attributable to the seepage in 1951, nor does it disclose whether the release covered such damage. We might well conclude that the release contemplated this damage in the absence of any showing that it did not. If it did not, and an ascertainable portion of the hay crop was damaged by the seepage of 1951, plaintiff's loss must be determined by evidence of the probable yield and value of such portion of the crop when marketed at maturity, less the expense of care, cultivation, harvesting, and market-

ing. See 4 Sutherland, Damages (4th ed.), p. 3798, sec. 1023.

In addition, plaintiff claims three of the 20 acres were planted in corn, harvested and shocked in the field in 1950, and lost through rotting in 1951 because he could not haul it off. He admitted that if he had attempted to do so when the ground was frozen it might have been possible to remove it, but in the absence of evidence showing that he was negligent in leaving it on the land until affected by the seepage occurring in 1951, he was entitled to recover the market value of the crop less his necessary expenses. There was no evidence as to the probable cost of getting the corn off the land and marketing it.

The jury found damages to land fertility in the amount of $163.50. Plaintiff was paid for all damages suffered by reason of the 1950 seepage. There was no showing that any previous loss of fertility had been restored before the 1951 seepage nor that the leeching in 1951 further decreased the already damaged soil. It was plaintiff's burden to show what loss in this respect was caused in 1951.

It was found that plaintiff suffered a $400 loss in the sale of cattle made necessary by his inability to raise sufficient feed. He testified that although he customarily sold no more than three cows a year, he sold eight out of his herd of 22 late in 1950 and early in 1951 because it was unprofitable to buy feed. It is undisputed that he received a good price for the cows sold, but he claimed loss of income in milk and calves because he was forced to dispose of them. He estimated such loss at $2,000 but produced no evidence on which such estimate could be based. It was pure speculation for the jury to assess the damage at $400.

The damage to plaintiff's wood lot was found to be $100. It would appear that the water standing in the wood lot in 1950 accounted for some damage to the trees; the 1950 re-

lease specifically covered any such damage. Plaintiff has not shown the extent of further damage occasioned by the 1951 seepage.

A new trial on damages is necessary. Plaintiff has shown that some damage was done in 1951 by seepage from the Petenwell flowage and that it was temporary, but the evidence as to the extent of such damage occurring in 1951 or the amount necessary to compensate therefor is vague and inconclusive. The amounts claimed on the various items are susceptible of proof to a reasonable certainty. Plaintiff must meet this quantum of proof.

"The evidence to warrant damages must show that plaintiff has sustained some injury and must establish sufficient data from which the court or jury can properly estimate the amount of damages, and an award of more compensatory damages than the evidence justifies cannot be sustained. Damages should be proved by statements of facts rather than by the mere conclusions of witnesses. Plaintiff's mere statement or assumption that he has been damaged to a certain amount without stating any facts on which the estimate is made is too uncertain." 25 C. J. S., Damages, p. 813, sec. 162.

*By the Court.*—In so far as the judgment is based on the findings that plaintiff suffered damage by reason of the construction and maintenance of defendant's dam and that such damage was temporary, it is affirmed; it is reversed and the cause remanded for a new trial on the issue of damages only. Each party to pay its own costs; appellant to pay clerk's fees.