Curtis J. ROBISON, Plaintiff-Appellee,

v.

Charles LESCRENIER and Gammex,
Inc., a Wisconsin Corporation,
Defendants-Appellants.

No. 82–2804.

United States Court of Appeals,
Seventh Circuit.

Argued May 12, 1983.
Decided Nov. 21, 1983.

**1102**

Kevin J. Lyons, Cook & Franke, S.C., Milwaukee, Wis., for defendants-appellants.

William J. French, Gibbs, Roper, Loots & Williams, Milwaukee, Wis., for plaintiff-appellee.

Before POSNER and COFFEY, Circuit Judges, and GIBSON, Senior Circuit Judge.*

COFFEY, Circuit Judge.

The plaintiff in this case initially sued the defendants for breach of contract. He subsequently amended his complaint to include an allegation of slander per se and a request for punitive damages. The jury returned a verdict for the plaintiff assessing $14,000.00 damages on the breach of contract claim, six-cents nominal damages on the slander claim and $10,000.00 punitive damages. The trial court denied the defendants' motion for judgment n.o.v. or, in the alternative, a new trial. From this denial the defendant appeals, raising five separate sets of issues: (1) whether there

was sufficient evidence to support both a finding of breach of contract and the $14,000.00 assessment of damages; (2) whether the district court erred in refusing to permit the introduction of evidence establishing a conditional privilege, and in denying an instruction on that privilege; (3) whether there was sufficient evidence of malice or ill will to warrant a punitive damage instruction; (4) whether the court erred in denying judgment n.o.v. to the defendants on the issue of punitive damages after the jury returned a verdict of only six-cents nominal damages on the slander claim; and (5) whether the punitive damage award should be reduced. We affirm.

**I.**

The defendant Charles Lescrenier ("Lescrenier") is the President, Chairman of the Board, and sole shareholder of the defendant, Gammex, Inc. ("Gammex"), a Wisconsin corporation engaged in the business of manufacturing systems utilized to align patients for X-ray and similar procedures. The plaintiff, Curtis Robison ("Robison") was employed by Gammex as vice president of sales for a seven-and-one-half month period from June 2, 1980 through January 16, 1981.

The parties stipulated that three letters exchanged between Gammex and Mr. Robison in May of 1980, along with two supplemental agreements signed on June 2, 1980, (these two agreements being irrelevant to the present action) constituted Robison's contract of employment with Gammex. The terms of the contract provided that Robison was to be paid a base salary of $3,333.34 per month, a car allowance of $200.00 per month and a bonus, the calculation of which was the main issue of dispute in the breach of contract action.

With regard to that bonus, the evidence reveals that Robison did not receive a bonus for the month of June, 1980, but did collect $3,333.34 or 100% of his base pay, for both the months of July and August. He also collected a bonus of $2,267.12 for September

---

* The Honorable Floyd R. Gibson, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

but did not receive a bonus for either the month of October or November. The company tendered a bonus check in the amount of $2,228.82 for the month of December, 1980, which Robison returned. Robison also was not paid a bonus for his work during the first fifteen days of the month of January, 1981.

The slander claim concerns a statement allegedly made by Lescrenier to Mr. Robert Fortier, who was retained by Gammex as a personnel and management consultant during the time period in question: "Curt [Robison] doesn't know this but I know he was fired from his last job and he has an ability to run all his companies out of money." The defendant Lescrenier denies ever making this statement, rather he attributes it to Mr. Fortier.

The jury found a breach of contract and assessed compensatory damages of $14,000.00. It also found that Lescrenier had in fact uttered the slanderous statement, and awarded six-cents nominal damages and $10,000.00 in punitive damages. The defendants' motion for judgment n.o.v. or, in the alternative, a new trial was denied. The district court entered judgment in favor of the plaintiff in the amount of $24,000.06. From this judgment the defendants appeal.

## II.

### A. Breach of Contract

The defendants argue that the district court erred in denying their motion for judgment n.o.v. or, in the alternative, a new trial on both the issue of breach of contract and the amount of damages. The Seventh Circuit has stated in *Oberman v. Dun & Bradstreet, Inc.,* 507 F.2d 349, 352 (7th Cir. 1974), that "in diversity cases the state law standard for judgment n.o.v. is applied." *See also Kuziw v. Lake Engineering Co.,* 586 F.2d 33 (7th Cir.1978).[1] The Wisconsin standard for determining the sufficiency of the evidence is codified in Wis.Stat. § 805.-14(1). It provides:

"(1) Test of sufficiency of evidence. No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and the reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party."

According to the Wisconsin Supreme Court:

"If there is any credible evidence which, under any reasonable view fairly admits of an inference that supports the jury's finding, neither the trial court nor an appellate court has any authority to change the jury's answer or findings."

*Lehman v. Sentry Ins. Co.,* 35 Wis.2d 96, 98, 150 N.W.2d 333 (1967) (footnote omitted). *See also Chart v. General Motors Corp.,* 80 Wis.2d 91, 110, 258 N.W.2d 680 (1977).

---

**1.** It should be noted that there is authority which takes the contrary position that federal courts apply the federal rather than the state test for determining the sufficiency of the evidence on a motion for directed verdict or for judgment n.o.v. *See Foster v. Ford Motor Co.,* 616 F.2d 1304 (5th Cir.1980); *Oldenburg v. Clark,* 489 F.2d 839 (10th Cir.1974); and Wright and Miller, *Federal Practice and Procedure,* § 2525. The federal standard as enunciated by *Foster* is as follows:

"If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury."

*Foster,* 616 F.2d at 1309 n. 10 (*quoting Boeing Company v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc)). Because the parties in this case did not dispute that state law governed with respect to the standard for review of a motion for judgment n.o.v., and because we find evidence in the record sufficient to meet either the federal or the state standard, we are unwilling in this case to reach the issue of whether the federal or state rule should apply and thereby question prior Seventh Circuit precedent.

■ In contrast to a motion for judgment n.o.v., the standard for reviewing a trial court's disposition of a motion for a new trial is controlled by federal law, even in diversity cases. *Galard v. Johnson*, 504 F.2d 1198, 1200 n. 4 (7th Cir.1974). Since "a motion for a new trial is addressed to the sound discretion of the trial judge," *Durant v. Surety Homes Corp.*, 582 F.2d 1081, 1088 (7th Cir.1978), the standard of review is abuse of that discretion. "The only question before us is whether the district court abused its discretion in concluding that the jury did not abuse its discretion." *Galard*, 504 F.2d at 1202. As our court pointed out in *Continental Air Lines, Inc. v. Wagner-Morehouse, Inc.*, 401 F.2d 23 (7th Cir.1968):

> "If the evidence in the record, viewed from the standpoint of the successful party, is sufficient to support the jury verdict, a new trial is not warranted merely because the jury could have reached a different result. [Citing cases.] Neither the trial court nor this Court may substitute its judgment for that of the jury on disputed issues of fact."

*Id.* at 30 (quoting *Gebhardt v. Wilson Freight Forwarding Co.*, 348 F.2d 129, 133 (3rd Cir.1965)).

■ The defendants argue that the trial court erred in failing to grant their motion for judgment n.o.v. or, in the alternative, a new trial because the evidence was insufficient to support the jury's finding of breach of contract or justify the $14,000.00 damage award. Turning first to the question of breach, our review of the record taken in the light most favorable to the successful party, Robison, demonstrates that there was more than sufficient credible evidence for the jury to find a breach of the employment contract.

As noted earlier, the essential terms of the contract between Robison and Gammex were established in the three letters and company attachments exchanged between the parties in May of 1980.[2] Since the only basis for a charge of breach of contract is the defendants' alleged failure to pay the bonuses agreed to, this opinion will only focus on those portions of the letters referring to the calculation and payment of the bonus.

In his May 5, 1980, letter to Curtis Robison, the defendant Lescrenier stated:

> "You will also receive a bonus based upon sales that will be paid monthly based upon cumulative year-to-date sales. Your bonus will amount to the percent of your base salary equal to the growth in sales over the previous year. Total sales will include all international and domestic sales."

On May 15, 1980, David Bierworth, Gammex's general manager, sent a letter to Curtis Robison stating:

> "Your bonus will be based on the Fiscal 1981 accumulative forecast curve reviewed quarterly. Draw bonus payments are on the 15th of the following month."

The evidence established that Robison received no bonus for the month of June, 1980, the first month of his employment with Gammex. Yet, our review of the three letters exchanged in May fails to reveal any language excluding June from the months in which Robison was entitled to a bonus. It cannot be denied that Mr. Lescrenier testified that he had entered into an "arrangement" with Mr. Robison which provided that no bonus would be paid in June. However, this testimony is of no value to the defendant as the parties stipulated that the terms of the contract were limited to those contained in the three letters exchanged in May in addition to the two supplemental agreements signed on June 2, 1980. These documents do not contain any language establishing that Robison was not to receive a bonus for the work he performed during June, 1980. Since Robison generated sales in June, and the contract stated "[Y]ou [Robison] will also receive a bonus based upon sales that will be paid monthly . . . ," without any qualifying language excluding the month of June, the

2. As also previously noted, two other supplemental agreements signed on June 2, 1980, were likewise part of the contract of employment. These supplemental agreements, however, are not germane to the present litigation.

failure to pay a bonus for that month is evidence sufficient in and of itself for the jury to find a breach.

The main bone of contention, however, is that the bonus payments were not calculated, and therefore not paid, as originally agreed in the contract. This aspect of the alleged breach will be developed further in our subsequent discussion of evidence supporting the damage award. Suffice it to say at this point in the analysis that our review of the record indicates that there was substantial evidence supporting an interpretation of a bonus calculation which was not in accord with the actual payments made. Our position in this regard is bolstered by the fact that the defendant Lescrenier prepared a document which set forth at least three separate interpretations or means of calculating Robison's bonus compensation. In addition, the defendant's accountant, Ms. Ergen, testified that the bonus actually paid in September of 1980 was inconsistent with the method of calculation of Robison's bonus for the months of July and August. This testimony indicates a change in the method of calculating Robison's bonus between August and September and therefore is substantial evidence in support of the jury's finding of breach.

The plaintiff also presented evidence establishing Gammex's and Lescrenier's motive for changing the method of calculating Robison's bonus; the goal being to reduce his bonus so that he would leave Gammex's employ. Mr. Robert Fortier testified that, following a Gammex Board meeting, Lescrenier told him:

"The Board told me I have to cut back Robison's compensation ... I have only got three alternatives."

\* \* \* \* \* \*

"My first alternative is to go against the Board and continue to pay him. My second alternative is to do nothing and my third alternative is to change his compensation package so he will leave.

\* \* \* \* \* \*

"Two of those I can't follow ... [t]hey are one and two."

Viewing the evidence, as we must, in the light most favorable to the plaintiff it is clear that Lescrenier had a definite motive to modify Robison's bonus. Since there are inconsistencies in the actual calculation and payment of Robison's bonus in addition to the failure to pay any bonus in June, a reasonable jury could properly conclude that a breach of contract had occurred. This much is even admitted by the appellants as they state in their reply brief that "the jury could conceivably have found a breach of contract supported by some credible evidence ...." Since there was credible evidence to support the jury's verdict, the trial court properly denied the defendants' motion for judgment n.o.v. or, in the alternative, a new trial on the issue of breach.

■ The defendants' next contention is that the record does not support the jury's award of $14,000.00 in damages for the breach of contract. We disagree. The contract provided that the bonus was to be paid monthly. The plaintiff presented evidence that the bonus was to be calculated in the following manner:

| Sales Shipped for Previous Quarter(s) of Year | | Growth Ratio of This Year |
|---|---|---|
| Sales Shipped for Same Quarter(s) of Preceding Year | $- 1 =$ | Over Last Year |

| Growth Ratio[a] x Base Pay (3333.34/month) | $=$ | Bonus for Each Month of the Quarter Following the Quarter(s) Used to Calculate the Growth Ratio |
|---|---|---|

*Plaintiff's Calculation of Damages*

| | Amt. Pd. | Amt. Due | Difference |
|---|---|---|---|
| *1st Q of F 81* | | | |
| July | 3333.34 | | |
| \*100% x 3333.34 | | 3333.34 | 0 |
| August | 3333.34 | | |
| 100% x 3333.34 | | 3333.34 | 0 |
| September | 2267.12 | | |
| 100% x 3333.34 | | 3333.34 | 1066.22 |
| *2nd Q of F 81* | | | |
| October | 0 | | |
| \*\* 93.98% x 3333.34 | | 3132.67 | 3132.67 |
| November | 0 | | |
| 93.98% x 3333.34 | | 3132.67 | 3132.67 |
| December | 0[b] | | |
| 93.98% x 3333.34 | | 3132.67 | 3132.67 |

---

[a] Each quarter a new ratio is calculated.
[b] Company offered $2228.82 but plaintiff refused.

| | Amt. Pd. | Amt. Due | Difference |
|---|---|---|---|
| *3rd Q of F 81* | | | |
| January | 0 | | |
| ***55.81% x 1667.67 | | 930.73 | 930.73 |
| (15 days of work = ½ | | | 11394.96 |
| base salary) | | | |
| + June—no bonus paid | 0 | 3333.34 | 3333.34 |
| | Total Owed | | 14728.30 |

\* 1st Q % = Forecasted growth for Fiscal 81/Fiscal 80 for same Q. Forecast was to double sales—*see* May 15, 1980 letter in appendix.

\*\* 2nd Q % = Actual 1st Q. Sales Fiscal 1981/ Same Quarter in Fiscal 1980 $\frac{39615408}{20421969}$ = 1.93984

= 98.98% growth over same quarter last year

\*\*\* 3rd Q % = Actual Year-to-Date Sales for 1st Two Quarters of Fiscal 1981/Year-to-Date for same period in Fiscal 1980 $\frac{75004311}{48139420}$ = 1.5580642

= 55.81% growth over same period last year

The May 15, 1980 letter stated that Robison's bonus was to be calculated based on the "Fiscal 1981 accumulated forecast curve reviewed quarterly." That curve called for a 100% increase in sales for the first quarter of 1981 and thus the growth ratio for that quarter—July, August and September— was 100%. That ratio multiplied times the base pay of $3,333.34 results in a $3,333.34

bonus due for each of those months. In fact, Robison was paid a bonus equal to his base pay ($3,333.34) for the months of July and August. In September, however, he was only paid $2,267.12. Thus, under his interpretation of the contract he was under-paid by $1,066.22. Moving to the second quarter, the growth ratio, since it was to be reviewed quarterly,[3] became the actual first quarter's sales in fiscal 1981 divided by that same quarter's sales in fiscal 1980. *See* diagram, *supra*. That calculation results in a growth ratio of 93.98%.[4] When that fig-ure is multiplied by $3,333.34 it produces a bonus of $3,132.67. Thus, under Robison's interpretation of the contract he should have been paid that amount for the months of October, November and December, that is, during the second quarter. He did not, however, receive a bonus for those months.[5]

Robison also worked fifteen days in Janu-ary. Thus, he was due a bonus for the half month he worked. Since the May 15, 1980 letter indicated that the growth ratio would be reviewed quarterly, a new ratio again had to be calculated based on the cumula-tive sales for the first two quarters of fiscal 1981 over the first two quarters of the previous year. That calculation results in a growth ratio of 55.81%. When 55.81% is multiplied by one half of a month's base pay ($1,667.67) it produces a bonus of

**3.** We are cognizant of the inconsistency con-tained in the May 15, 1980 letter concerning the question of how frequently the growth ratio was to be reviewed. *See* appendix, *infra*. The second paragraph of the May 15 letter states that Robison's bonus was to be "based on the Fiscal 1981 accumulated forecast curve *re-viewed quarterly.*" (Emphasis added.) Quar-terly review is consistent with the bonuses ac-tually paid in July and August since, as we indicated in the text, Robison was paid 100% of his base salary in each of those months which agrees with the forecasted doubling of sales in Fiscal 1981. After July and August the means of calculating Robison's bonus was al-tered. This change in calculating the bonus corresponds with Lescrenier's statement to Fortier that his only available alternative was to modify Robison's compensation package so that he (Robison) would terminate his employ-ment.

The May 15, 1980 letter also states in para-graph four, however, that enclosed table 2 "shows the mechanics of how your bonus is calculated *on a monthly basis.*" Thus, the let-

ter is inconsistent as to whether the growth ratio is to be reviewed on a quarterly or month-ly basis. The jury, having before it the May 15 letter, the enclosed table, the deposition testi-mony of Mr. Fortier, and the testimony of Ms. Ergen, Gammex's accountant, that the amount of the September bonus was inconsistent with the July and August bonuses, resolved the in-consistency in favor of a quarterly review. As we stated, the actual payments made in July and August support the jury's interpretation. Thus, there was ample evidence for the jury to conclude that Gammex initially reviewed the growth ratio on a quarterly basis and then changed its method of calculation.

**4.** The actual ratio obtained is 1.93984. To ar-rive at the growth ratio for that quarter "1" must be subtracted from that figure.

**5.** The company offered to pay $2,228.82 in the month of December but the plaintiff returned the company's check.

$930.73 which was not paid and therefore became part of the damages claimed by Robison. *See* diagram, *supra*. The sum of the allegedly unpaid bonuses total $11,-394.96.[6] The plaintiff elicited the numbers for the preceding calculation from the cross-examination of Gammex's accountant, Ms. Ergen.

In addition to the $11,394.96 of alleged damages for the first and second quarters of fiscal 1981 and the first fifteen days of January, Robison also claimed that he was due a bonus for the month of June, his first month of employment with Gammex. Assuming he was paid 100% of his base salary as he was in July and August that aggregates to a total of $14,728.30 in unpaid bonus under the contract. Although the defendants refer to this method of calculation as "hypothetical," it is completely consistent with the amounts actually paid to Robison in the first two months of the first quarter and is also consistent with the terms of the three letters exchanged in May. Thus, the jury reasonably could have chosen to accept the plaintiff's method of calculating damages under the contract, and its award of $14,000.00 was well within the range of damages obtainable under that method of calculation.

The defendants argue that "[a]n award of compensatory damages in excess of the amount supported by the evidence cannot be sustained as it is based on mere speculation." For this proposition they cite *Bell v. Gray-Robinson Const. Co.,* 265 Wis. 652, 62 N.W.2d 390 (1954), and *Krcmar v. Wisconsin River Power Co.,* 270 Wis. 640, 72 N.W.2d 328 (1955). The *Bell* court stated:

> "In determining the amount of damages, the jurors should proceed upon the description of the subject as they find it from the testimony, and they should avail themselves of such aid as is afforded them in the opinions of witnesses as to values of property involved. Their findings may be more or less in amount than as stated by any witness. Where there is

a legal measure of damages, the jury must determine the amount as a fact according to that measure; and whether they have done so or not in a given case may be proximately seen by a comparison of the verdict with the evidence."

*Bell,* 265 Wis. at 659, 62 N.W.2d at 393. Our review of the record and the preceding analysis convinces us that the jury did in fact assess damages in accordance with the testimony viewed most favorably to the plaintiff, and therefore the award is not based on "mere speculation." A comparison of the jury's $14,000.00 verdict with the $14,728.30 damage figure which the evidence could support demonstrates that no error occurred. Thus, the trial court properly denied the defendants' motion for judgment n.o.v. or, in the alternative, a new trial on this issue. As this court stated in *Continental Air Lines, Inc. v. Wagner-Morehouse, Inc.,* 401 F.2d 23, 30 (7th Cir. 1968):

> "Of course, there was contradictory evidence with which we need not be too much concerned. It was not the function of the trial court and neither is it that of this court to weigh the testimony which proves or tends to prove the conflicting theories of the parties. That was peculiarly the function of the jury as the trier of the facts, and it is our judgment that the evidence furnished a substantial basis for its verdict in favor of [Robison]."

## B. *Conditional Privilege*

The defendants next contend that the trial court erred: (1) in failing to permit the introduction of evidence on the defense of conditional privilege to the plaintiff's slander claim, and (2) in failing to give a requested jury instruction on that privilege. Although the defendants in their statement of issues raised the question of whether the trial court erred in excluding evidence on the defense of conditional privilege they fail to delineate or argue that any particu-

---

**6.** The figure produced at trial through the testimony of Ms. Ergen, Gammex's accountant, was $11,394.41. The difference of 55 cents is mostly attributable to Ms. Ergen's calculation of the January bonus. She apparently committed a multiplication error and arrived at a figure of $930.17. Any additional deviation is due to rounding error.

lar evidence was excluded. Rather, they construct their entire argument around the court's failure to instruct on that privilege. Therefore, we will not consider as an issue in this case the court's exclusion of any evidence tending to establish a conditional privilege since the defendants have failed to demonstrate that such evidence was actually excluded, and we decline to speculate as to what that evidence might be. Instead, we focus our attention on the question of whether the court erred in failing to instruct on conditional privilege.

The plaintiff's slander claim is based on the following statement allegedly made by Lescrenier to Mr. Robert Fortier: "Curt doesn't know this but I know he was fired from his last job and he has an ability to run all his companies out of money." The defendants have asserted that this statement was conditionally privileged. Their argument fails for two reasons: (1) no conditional privilege ever arose, and (2) if such a privilege did exist it was abused because there were no reasonable grounds to believe that the above-quoted statement was true at the time it was made.

■ The substantive law of Wisconsin governs the question of whether there was in fact a conditional privilege, since the district court's jurisdiction in this action was based on diversity. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Wisconsin has adopted the Restatement's approach respecting conditional privilege. *See Converters Equipment Corp. v. Condes Corp.,* 80 Wis.2d 257, 264, 258 N.W.2d 712 (1977). The Restatement provides:

"An occasion makes a publication conditionally privileged if the circumstances induced a correct or reasonable belief that

(a) There is information that affects a sufficiently important interest of the publisher, and

(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest."

Restatement (Second) of Torts § 594 (1981). *See also* Wis.Civ.J.I. 2517. Thus, under Wisconsin law "an occasion is conditionally privileged if the communication 'affects a sufficiently important interest of the publisher' and 'the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.'" *Converters,* 80 Wis.2d at 264, 258 N.W.2d 712 (*quoting* Restatement § 594). "The burden is on defendant to prove privilege as a defense to an action for defamation." *Otten v. Schutt,* 15 Wis.2d 497, 504, 113 N.W.2d 152 (1962).

■ The defendants argue that the allegedly defamatory statement was made to protect a business interest since it was stated to Mr. Fortier who was employed at the time by Gammex as a personnel and management consultant. The defendants assert that the comment was uttered in the "context of a discussion of problems Lescrenier was experiencing with this particular employee [Robison], a discussion had in confidence with a person hired specifically to deal with personnel problems, i.e., Fortier." While under other circumstances such an interest might give rise to a conditional privilege, the defendants in the present case have failed to establish any basis in the record for this assertion, and have therefore failed to demonstrate the existence of facts giving rise to a conditional privilege, as was their burden.

The comments to clause (a) of § 594 of the Restatement provides:

"For the conditional privilege to arise under the rule stated in this Section, it is not necessary that the publisher's interest be actually in danger. It is enough that the circumstances are such as to lead a reasonable man to believe that the interest is in danger and that the defamatory publication is reasonably necessary for its protection."

Restatement (Second) of Torts § 594 comment h. The problem in this case, however, is that the defendants have not proven circumstances which would "lead a reasonable man to believe that the interest is in danger and that the defamatory publication is reasonably necessary for its protection." To justify their position that the statement

was made in a situation where Lescrenier's business interest (the performance or nonperformance of a particular employee) was the focus of the conversation, they cite to the following testimony of Mr. Fortier:

"A. It was not a discussion of personalities. It was a discussion relative to the function of the performance of their tasks as he viewed them.

"Q. You don't think, though, that he [Lescrenier] was inviting your judgment as to whether or not they were properly doing their job, do you?

"A. He was certainly asking for it."

Taken out of context this exchange might support the defendants' assertions regarding the existence of a business interest, however, such is not the case when the testimony is viewed in its entirety. Examined in its proper context the meaning and import of the above-quoted testimony becomes clear; it was a discussion of Fortier's general duties as a consultant which included advice on personnel problems. The fact remains, however, that the defendants have not established that *at the time the statement was made,* the circumstances were such as to induce a reasonable man to believe that the information communicated in the defamatory statement affected a sufficiently important business interest of the publisher, Lescrenier. For example, there is no indication in the record that Fortier was at the time of the communication "consulting" about Robison or that Lescrenier was actually seeking advice regarding any problem he had with Robison. Since, according to Fortier, the slanderous statement apparently was made near the end of Robison's tenure with Gammex, and since Lescrenier had previously stated in effect that his only alternative was to change Robison's compensation package so that he would leave (Fortier testified that Lescrenier made this statement following the August or September board meeting), it seems that Lescrenier had already made his decision to force Robison to resign, making any consulting on that subject moot. Be that as it may, it is apparent to this court that the

defendants failed to carry the burden of showing circumstances which would lead a reasonable man to believe: (1) that there was any interest (business or otherwise) in danger at the time the statement was made; and (2) that the defamatory publication was reasonably necessary for its protection.

Our examination of the record did reveal that Lescrenier testified that during the conversation in which the above-noted slanderous statement was made, Fortier was consulting with him in the capacity of sales and personnel. However, there is no documentation or evidentiary support for this assertion in the record such as a written report, notes or corroborating testimony by Fortier. Without such evidence it is obvious the defendants did not establish either the requisite business interest or the need for the defamatory publication to protect that interest. Thus, we conclude that no conditional privilege arose, and that no error occurred in the trial court's refusal to instruct on that privilege.

 Even if we were to conclude that the circumstances gave rise to a conditional privilege, we hold that Lescrenier abused the privilege as a matter of law. As the Wisconsin Supreme Court recognized in *Ranous v. Hughes,* 30 Wis.2d 452, 151 N.W.2d 251 (1966), the privilege is only conditional and may be lost if abused.

"One who publishes false and defamatory matter of another upon a conditionally privileged occasion is liable to the other if he abuses the occasion."

*Id.* at 468, 141 N.W.2d 251 (quoting Restatement (Second) of Torts § 599). The *Ranous* court went on to delineate the possible ways the conditional privilege could be abused.

"The Restatement further lists the four conditions which may constitute an abuse of the privilege, and the occurrence of any one causes its loss. These are: (1) The defendant either did not believe in the truth of the defamatory matter or, if believing the defamatory matter to be true had no reasonable grounds for so believing; (2) because the defamatory matter was published for some purpose

other than that for which the particular privilege is given; (3) because the publication was made to some person not reasonably believed to be necessary for the accomplishment of the particular privilege; or (4) because the publication included defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the privilege is given."

*Id.* at 468, 141 N.W.2d 251 (footnotes omitted) (citing Restatement (Second) of Torts §§ 600–01, 603–05). The preceding quote has been incorporated in Wisconsin Civil Jury Instruction 2517. That instruction states, in relevant part:

"1. An abuse of the defendant's conditional privilege occurred if the defendant at the time of (making the statement) . . . did not believe in the truth of his defamatory (statement) . . . or, though he believed the defamatory (statement) . . . to be true, had no reasonable grounds for so believing. Reasonable grounds to believe means that the facts and circumstances available to the defendant at the time the (statement was made) . . . were sufficient in themselves to lead a man of reasonable caution and prudence to believe that the (statement) . . . was true."

Our review of the record reveals no facts or circumstances which could reasonably lead the defendant, at the time the defamatory statement was made, to believe that what he said to Mr. Fortier, as found by the jury, was true. In fact, an examination of the record indicates just the opposite, i.e., that he believed, and had on occasion stated, that Robison was a good worker; hardly the attributes of one who was fired for running his prior companies out of money. For example, Lescrenier testified that he told his Board of Directors that he was proud to have Robison on the Gammex's sales force and that he was "delighted to have a competent professional who knew

the field." In addition he told the Board that Robison "was a very loyal employee," "a workaholic," "a natural-born salesman," etc. Mr. Fortier also testified that Lescrenier stated that "Mr. Robison was the best he had ever seen, that he knew everybody in the industry, that he really knew his business and that while he was the highest paid employee at Gammex that Mr. Lescrenier had stolen him." Lescrenier himself testified that he conferred with Robison's former employer, the president of Xonics, before hiring Robison, and that his former employer spoke highly of Robison. The above-noted statements, along with our examination of the record, lead us to conclude that there was no reasonable grounds for any belief that Robison was fired from his previous job and that he had an ability to run all his companies out of money. Note that the defendants neither argued the truth of the defamatory statement nor presented any evidence which could lead one to a "reasonable belief" that the slanderous statement was true. Since we hold as a matter of law that the privilege was abused, a failure to instruct on that privilege was harmless error at best.[7]

The defendants argue that the trial court's refusal to instruct on conditional privilege was not harmless error, however, because the jury was then precluded from weighing the statement, and the circumstances surrounding its utterance, in its business context during their deliberations concerning malice. We find this argument without merit because, as we have previously stated, there is no evidence in the record to support a reasonable belief that the defamatory statement was true. Without evidence supporting such a reasonable belief, we fail to understand how, in any context, that statement could have been made without malice or ill will.[8] *See* discussion con-

---

**7.** Note that our prior discussion concerning the very existence of a conditional privilege also raises a question of whether Lescrenier abused that privilege because the defamatory matter was published for a purpose other than that for which the particular privilege was given. *Ranous,* 30 Wis.2d at 468, 141 N.W.2d 251. We do not pass on this question because of our

finding of abuse for the reasons stated in the text.

**8.** The plaintiff also argues that the trial court did not err because (1) the defendants waived their right to rely on a conditional privilege defense by failing to assert that defense in a responsive pleading as required by Fed.R.Civ.P.

cerning the evidence justifying a finding of malice or reckless disregard, *infra*.

### C. *Punitive Damages*

The defendants' final arguments concern the $10,000.00 award of punitive damages. The defendants contend: (1) that the record does not support an instruction on punitive damages because there was insufficient evidence for the jury to find malice on the part of the defendant Lescrenier; (2) that an award of punitive damages cannot be based on a six-cent nominal damage award; and (3) that the amount of punitive damages awarded was disproportionate to the amount of nominal damages and therefore a remittitur by this court is required.

■■■ The defendants' first contention is that there was an insufficient showing of malice to warrant an instruction on punitive damages. In order to sustain an award of punitive damages in Wisconsin the plaintiff must show that the defendant acted either maliciously or in a wanton, willful or reckless disregard of the plaintiff's rights. *See Jeffers v. Nysse*, 98 Wis.2d 543, 547, 297 N.W.2d 495 (1980). *See also*, Ghiardi and Kircher, *Punitive Damages—Law and Practice* § 5.01 (Supp.1983). Our review of the record indicates that there is credible evidence to support a finding of malice and/or reckless disregard of Robison's rights. Therefore, we hold that the trial court did not err in instructing the jury on punitive damages.

The record demonstrates that Lescrenier was originally very enthusiastic about his new employee, the plaintiff Robison. In fact, he indicated to Mr. Fortier early in Robison's tenure that "Mr. Robison was the best he had ever seen, that he knew everybody in the industry, that he really knew his business and that while he was the highest paid employee at Gammex that Mr. Lescrenier had stolen him." Then about the time of the August or September Gammex board meeting, this enthusiasm waned since it was during this period that Lescrenier told Mr. Fortier that one of the board members had expressed concern over Robison's pay. Following one of those board meetings, Lescrenier mentioned to Mr. Fortier that his only available alternative was to "change [Robison's] compensation package so that he [would] leave." Finally, near the end of Robison's tenure, Lescrenier remarked: "Curt doesn't know this but I know he was fired from his last job and he has an ability to run all his companies out of money."

We are unable to understand how the defendants can logically argue that this statement was not made with the requisite malice and/or reckless disregard of Robison's rights. The defendants did not attempt at trial to establish any reasonable basis for this statement, nor did they try to do so in their briefs to this court. In fact, as the plaintiff's brief points out, this statement directly contradicted the defendant Lescrenier's own testimony that Robison came highly recommended from his previous employer. Thus, as we previously indicated, there is no basis in the record for any reasonable belief that the defamatory statement that Robison was fired and had financial problems with prior companies was true. The Supreme Court of Wisconsin very early recognized:

> "The making of a false accusation, knowing it to be false, could hardly be regarded as otherwise than malicious."

*Noonan v. Ortin*, 32 Wis. 106, 113 (1873). Since we find no reasonable basis for the belief that the defamatory statement made by Lescrenier was true, we hold that there is sufficient credible evidence in the record to sustain a finding of malice and/or reckless disregard of Robison's rights. There-

12(b) and Wis.Stat. § 802.06(2); and (2) the jury's award of punitive damages with its necessarily corresponding finding of malice took the question of conditional privilege out of the case under *Polzin v. Helmbrecht*, 54 Wis.2d

578, 196 N.W.2d 685 (1972). We do not reach these grounds due to our holding that it was harmless error, assuming that the privilege arose and was not waived, to refuse an instruction on that privilege.

fore, the district court properly instructed the jury on punitive damages.[9]

■ The defendants next argue that the punitive damage award must be reversed because under Wisconsin law punitive damages cannot be recovered when only nominal damages are awarded for the underlying cause of action. To support this position, they cite to the early Wisconsin case of *Barnard v. Cohen,* 165 Wis. 417, 162 N.W. 480 (1917). We decline to pass on this issue, however, because the defendants failed to object to the following instruction either before or after it was given to the jury: "If you award as much as six cents, or nominal damages, then you may award punitive damages." The defendants also did not raise this alleged error in their post-verdict motions. Federal Rule of Civil Procedure 51 specifically states:

> "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

Thus, the failure to raise an objection to this instruction waives any error therein. In *McGrath v. Zenith Radio Corp.,* 651 F.2d 458 (7th Cir.) *cert. denied,* 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981), the defendants neglected to object at trial to the inclusion of jury instructions on the plaintiff's loss of future earning capacity resulting from his termination of employment. On appeal they contended that such damages were not available under the theories presented by the plaintiff. This court held that:

> "Having failed to object to these instructions at the time of their submission, as is required by F.R.C.P. 51, defendants have waived any errors therein. Questions as to the measure of damages may not be considered on appeal where they have not been raised at trial. . . . Conse-

quently, the alleged errors in the common law fraud and contract counts are not preserved for appellate review and we may not pass upon them."

651 F.2d at 470–71 (footnote and citations omitted). We arrive at the same conclusion.

The defendants cite to several places in the record to support their argument that they did not waive their right to challenge the award of punitive damages based on nominal damages. However, an examination of those parts of the record wherein the defendants contend they preserved their right to appeal reveals that they never actually argued that punitive damages cannot be based on nominal damages in Wisconsin. Rather, their objections and motions concerned the questions of whether the plaintiff had actually proved compensatory or nominal damages and whether the evidence gave rise to a conditional privilege. Without an objection to the above-mentioned instruction specifically raising the issue of the recoverability of punitive damages in Wisconsin when only nominal damages are awarded on the underlying cause of action, as required by Fed.R.Civ.P. 51, the defendants have not preserved the question for appeal and thus we decline to pass on the merits of this claim. *See Ellis v. City of Chicago,* 667 F.2d 606 (7th Cir.1981).

■ Finally the defendants argue that the $10,000.00 award of punitive damages should be reduced through remittitur because that award is disproportionate to the six-cent nominal damage award. They rely on *Barnard v. Cohen,* 165 Wis. 417, 162 N.W. 480 (1917), and *Wozniak v. Local 1111 of UE,* 57 Wis.2d 725, 205 N.W.2d 369 (1973) which stated that "punitive damages should be proportionate with compensatory damages." *Wozniak,* 57 Wis.2d at 731, 205 N.W.2d 369. They point out that under Wisconsin law, a court may order a remitti-

---

**9.** The defendants also argue that there is no evidence that the plaintiff incurred any actual damages because of Lescrenier's slanderous statement. Apart from our determination that the defendants waived any argument concerning the assessment of punitive damages based on nominal damages, *see* discussion, *infra,* we simply note that in Wisconsin, damages are presumed in slander *per se* cases such as we have here. *See Martin v. Outboard Marine Corp.,* 15 Wis.2d 452, 113 N.W.2d 135 (1962); *Lawrence v. Jewell Companies, Inc.,* 53 Wis.2d 656, 193 N.W.2d 695 (1972); and Prosser, *Law of Torts* § 112 (4th ed. 1971).

tur or, in the alternative, a new trial at the option of the plaintiff, if it determines that the damages awarded are excessive. *See Powers v. Allstate Ins. Co.,* 10 Wis.2d 78, 102 N.W.2d 393 (1960). Such power is also vested in federal courts. *See Ehret Company v. Eaton, Yale & Towne, Inc.,* 523 F.2d 280 (7th Cir.1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 186 (1976). Thus, the question is whether the $10,000.00 award of punitive damages is excessive.

As the defendants correctly point out, Wisconsin has at times enunciated a rule that punitive damages should be proportionate to compensatory damages. However, such a rule is not etched in granite. In *Fahrenberg v. Tengel,* 96 Wis.2d 211, 291 N.W.2d 516 (1980) the Wisconsin Supreme Court stated:

"This court has said that 'the test of excessiveness [of punitive damages] does not necessarily depend upon some arbitrary proportion .... Punitive damages ought to serve its purpose.' *Malco v. Midwest Aluminum Sales Co.,* 14 Wis.2d 57, 66, 109 N.W.2d 516 (1961). *See also* Prosser, *Law of Torts* 14 (4th Ed.1971). The amount to be awarded for punitive damages must be decided on a case-by-case basis; the circumstances of each case must be considered....

"Punitive damages are not awarded to compensate the plaintiff for the loss sustained. They are allowed for purposes of public policy to punish the wrongdoer and to deter him and others from future similar wrongdoing.... An award which is more than necessary to serve its purpose (punishment and deterrence) or which inflicts a penalty or burden on the defendant which is disproportionate to the

wrongdoing is excessive and is contrary to public policy.

"Factors to be considered in determining the proper amount to be awarded as punitive damages include: the grievousness of the defendant's acts; the degree of malicious intention; the potential damage which might have been done by such acts as well as the actual damage; and the defendant's ability to pay."

*Id.* 96 Wis.2d at 233–34, 291 N.W.2d 516 (citations omitted). Our examination of the record reveals that the $10,000.00 award, although near the top end of any reasonable amount which could be assessed, serves the purpose for which punitive damages are allowed, that is, punishment and deterrence without inflicting a penalty or burden. Therefore, we refuse to modify the jury's assessment of $10,000.00 in punitive damages.[10] Note that the court in *Fahrenberg* stated "[t]his court has never held, however, that there is any mathematical formula for calculating punitive damages on the basis of compensatory damages ...." *Id.* at 233, 291 N.W.2d 516. Thus, we disagree with the defendants' contention that the mere fact that the award of punitive damages is "disproportionate" to the nominal damages mandates a remittitur.[11]

The defendants argue that very little, if any, actual damage resulted from Lescrenier's statement concerning the plaintiff. They fail to recognize, however, that one of the factors to be considered is the "potential damage which might have been done" to Robison. As a salesman, his livelihood depends on his reputation, and therefore the potential damage was substantial. We also note that the defendants never requested a remittitur in their post-trial motions. For this additional reason we refuse

**10.** The Wisconsin Supreme Court in *Wozniak* held that it is "relevant to consider the maximum fine in the Wisconsin Criminal Code governing similar offenses" in determining the excessiveness of punitive damages. 57 Wis.2d at 731, 205 N.W.2d 369. *See also Fahrenberg,* 96 Wis.2d at 233, 291 N.W.2d 516. The maximum fine for defamation in Wisconsin is $10,000.00. Wis.Stat. §§ 942.01, 939.51. Thus, the damages assessed by the jury fall within the maxi-

mum fine for the corresponding criminal offense.

**11.** Dobbs points out that "a number of courts have said that the punitive award must bear some reasonable relation to the amount of compensatory damages awarded," however he also notes that "[a] substantial number of other courts have now rejected any such flexible rule ...." Dobbs, *Handbook on the Law of Remedies* § 3.9 (1973).

to grant such a request on appeal since the district court, who is in a better position to assess the evidence, was never given the opportunity to pass on the question of the excessiveness of the amount of punitive damages.

Based on the foregoing analysis, we hold that the trial court did not err in denying the defendants' motion for judgment n.o.v. or, in the alternative, a new trial.

AFFIRMED.

## APPENDIX

The three letters exchanged in May, 1980.

May 5, 1980

Curtis J. Robison
1560 Sandburg Terrace
Chicago, Illinois 60610

Dear Curt:

I am pleased to offer you the position as Vice President of Sales for Gammex, Inc. In this position you will be considered part of the Top Management of Gammex and will be a member of the Executive Committee which presently consists of the President and General Manager. Initially for an orientation/training period you will be reporting to Charles Lescrenier, President; subsequently, you will be reporting to David Bierworth, General Manager. Your appointment as an officer of Gammex will be considered by the Board of Directors at a later date.

Your starting salary will be $3,333.34 per month paid semi-monthly. In addition, you will also receive $200.00 per month car allowance based on the submission of an expense report each month for this amount. You will also receive a bonus based upon sales that will be paid monthly based upon cumulative year-to-date sales. Your bonus will amount to the percent of your base salary equal to the growth in sales over the previous year. Total sales will include all international and domestic sales.

No deferred compensation package is available at this time. However, Gammex is agreeable to work out a plan. The alternatives considered will include a plan for loaning all or part of the bonus to the Company at a predetermined interest rate.

Your base salary and performance will be evaluated at least once per year.

Your starting date will be on or about June 1, 1980. Effective July 1, 1980 you will be eligible to receive our Aetna Hospitalization and Major Medical Plan and life insurance in the amount of $40,000.00. You will be entitled to the standard fringe benefit package including two weeks vacation after one year, holiday pay, sick pay, etc.

All reasonable expenses in connection with your relocation to Milwaukee will be reimbursed by Gammex.

Your appointment is contingent upon execution of the Gammex Employee Priority Information Agreement.

Dave and I look forward to working with you. We are confident that you will make significant contributions to the Company and your personal growth can parallel that of Gammex.

Sincerely,

Charles Lescrenier
President
CL:maf

May 15, 1980

Curtis J. Robison
1560 Sandburg Terrace
Chicago, Illinois 60610

Dear Curt:

Enclosed are "Confidential" graphs and tables of financial data showing our sales history. Graph 1 plots the growth in annual sales from Fiscal 1974 to present. As you can see, the projection of doubling sales in the next three (3) years is consistent with our historical trends.

Graph 2 shows monthly sales for the past four (4) years and a projection of Fiscal 1981 double that of Fiscal 1980. Your bonus will be based on the Fiscal 1981 accumulated forecast curve reviewed quarterly. Draw bonus payments are on the 15th of the following month.

Table 1 shows a series of hypothetical projections of annual sales for the next three

APPENDIX—Continued

(3) years and the corresponding amount of bonus.

Table 2 shows the mechanics of how your bonus is calculated on a monthly basis. The table at the top shows a hypothetical projection of monthly sales for Fiscal 1981 and the ratio of the growth over Fiscal 1980. The lower half of the page shows how these figures would be used to calculate your monthly bonus.

I hope this provides the information you desire.

In order to make the plans and arrangements to receive you on June 1st, I would appreciate you notifying Les or me of your acceptance in writing by May 19th.

If you have any further questions, please don't hesitate to call Les or me.

Sincerely,

Davied Bierworth
General Manager

DB:maf

Enclosures
(enclosures deleted)

RECEIVED MAY 21, 1980
1560 Sandburg
Chicago, IL 60610
*(not dated)*

Charles Lescrenier, President
Gammex, Inc.
6685 North Sidney Place
Milwaukee, WI 53209

Dear Les:

I am delighted to accept the position of Vice President of Sales for Gammex, Inc., and I am pleased to become a member of your Executive Committee. I look forward to being appointed as an officer of Gammex by the Board of Directors.

The starting date of June 1, 1980, is satisfactory to me as I will be submitting a letter of resignation to Xonics Medical Systems effective May 31.

Although the bonus compensation program is not to my total satisfaction, I assume that in succeeding years the base salary will be adjusted as sales volume does indeed increase.

I am looking forward to working with you and Dave for the betterment of Gammex.

Sincerely,
/s/ CURT
Curt Robison